Ramsey CLARK et al., Plaintiffs,

v.

Francis R. VALEO, Secretary of the United States Senate, et al., Defendants.

No. 76–1825.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 10, 1976.

Decided Jan. 21, 1977.

As Amended Jan. 24, 1977.

Judgment Affirmed June 6, 1977.

See 97 S.Ct. 2667.

Larry P. Ellsworth, Washington, D.C., with whom Alan B. Morrison and Girardeau A. Spann, Washington, D.C., were on the brief, for plaintiff Clark.

Rex E. Lee, Asst. Atty. Gen., Washington, D.C., with whom Earl J. Silbert, U.S. Atty., and Leonard Schaitman, Anthony J. Steinmeyer, and Paul Blankenstein, Attys., App. Section, Civ. Div., Dept. of Justice, Washington, D.C., were on the brief, for intervening plaintiff United States.

Cornelius B. Kennedy, Washington, D.C., for defendant Valeo.

Eugene Gressman, Washington, D.C., for defendant Edmund L. Henshaw, Clerk of the United States House of Representatives.

Charles N. Steele, Atty., Federal Election Commission, Washington, D.C., with whom John G. Murphy, Jr., Gen. Counsel, Washington, D.C. (at the time the brief was filed), and William C. Oldaker, Asst. Gen. Counsel (at the time the brief was filed), Federal Election Commission, Washington, D.C., were on the brief, for defendant Federal Election Commission.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, and WILKEY, Circuit Judges, sitting *en banc*.

Opinion for the court *per curiam.*

Concurring opinion, in which BAZELON, Chief Judge, and J. SKELLY WRIGHT, Circuit Judge, join, filed by TAMM, Circuit Judge.

Concurring opinion filed by LEVEN-THAL, Circuit Judge.

Dissenting opinion filed by SPOTTS-WOOD W. ROBINSON, III, Circuit Judge.

Dissenting opinion filed by MacKINNON, Circuit Judge.

PER CURIAM:

 Ramsey Clark, then a candidate for the nomination of the Democratic Party to run for United States Senator from New York, commenced this action to obtain declaratory and injunctive relief against operation of the provisions governing legislative review of rules, regulations, and advisory opinions of the Federal Election Commission.[1] The United States of America, on behalf of the President and the Executive Branch, was granted permissive intervention by the District Court. Five constitu-

---

1. Three essentially similar legislative review provisions arising in the Federal Election Campaign Act Amendments of 1974, Pub.L. No. 93–443, 88 Stat. 1263 (FECAA of 1974), and amended by the Federal Election Campaign Act Amendments of 1976, Pub.L. No. 94–283, 90 Stat. 475 (FECAA of 1976), are challenged in this suit. They are: 2 U.S.C. § 438(c) in FECA itself, and 26 U.S.C. §§ 9009(c), 9039(c) in Subtitle H of the Internal Revenue Code of 1954. The latter two Subtitle H provisions are at issue before the three-judge District Court convened in this matter as well. In addition, advisory opinions rendered by the Commission under 2 U.S.C. § 437f, which state a general rule of law not stated in FECA or in Subtitle H, "may be initially proposed by the Commission only as a rule or regulation pursuant to the procedures established by section 438(c) * * *." 2 U.S.C. § 437f(a).

The challenged review provisions provide in full:
2 U.S.C. § 438(c):

(c) *Review of Regulations.*

(1) The Commission, before prescribing any rule or regulation under this section, shall transmit a statement with respect to such rule or regulation to the Senate or the House of Representatives, as the case may be, in accordance with the provisions of this subsection. Such statement shall set forth the proposed rule or regulation and shall contain a detailed explanation and justification of such rule or regulation.

(2) If the appropriate body of the Congress which receives a statement from the Commission under this subsection does not, through appropriate action, disapprove the proposed rule or regulation set forth in such statement no later than 30 legislative days after receipt of such statement, then the Commission may prescribe such rule or regulation. In the case of any rule or regulation proposed to deal with reports or statements required to be filed under this subchapter by a candidate for the office of President of the United States, and by political committees

supporting such a candidate both the Senate and the House of Representatives shall have the power to disapprove such proposed rule or regulation. Whenever a committee of the House of Representatives reports any resolution relating to any such rule or regulation, it is at any time thereafter in order (even though a previous motion to the same effect has been disagreed to) to move to proceed to the consideration of the resolution. The motion is highly privileged and is not debatable. An amendment to the motion is not in order, and it is not in order to move to reconsider the vote by which the motion is agreed to or disagreed to. The Commission may not prescribe any rule or regulation which is disapproved under this paragraph.

(3) If the Commission proposes to prescribe any rule or regulation dealing with reports or statements required to be filed under this subchapter by a candidate for the office of Senator, and by political committees supporting such candidate, it shall transmit such statement to the Senate. If the Commission proposes to prescribe any rule or regulation dealing with reports or statements required to be filed under this subchapter by a candidate for the office of Representative, Delegate, or Resident Commissioner, and by political committees supporting such candidate, it shall transmit such statement to the House of Representatives. If the Commission proposes to prescribe any rule or regulation dealing with reports or statements required to be filed under this subchapter by a candidate for the office of President of the United States, and by political committees supporting such candidate it shall transmit such statement to the House of Representatives and the Senate.

(4) For purposes of this subsection, the term "legislative days" does not include, with respect to statements transmitted to the Senate, any calendar day on which the Senate is not in session, and with respect to statements transmitted to the House of Representatives, any calendar day on which the House

tional questions were certified to this court *en banc*, pursuant to the unique judicial review provision of the Federal Election Campaign Act, as amended (FECA).[2] In

of Representatives is not in session, and with respect to statements transmitted to both such bodies, any calendar day on which both Houses of the Congress are not in session.

(5) For purposes of this subsection, the term "rule or regulation" means a provision or series of interrelated provisions stating a single separable rule of law.

26 U.S.C. §§ 9009(c) & 9039(c):

(c) *Review of regulations.*

(1) The Commission, before prescribing any rule or regulation under subsection (b), shall transmit a statement with respect to such rule or regulation to the Senate and to the House of Representatives, in accordance with the provisions of this subsection. Such statement shall set forth the proposed rule or regulation and shall contain a detailed explanation and justification of such rule or regulation.

(2) If either such House does not, through appropriate action, disapprove the proposed rule or regulation set forth in such statement no later than 30 legislative days after receipt of such statement, then the Commission may prescribe such rule or regulation. Whenever a committee of the House of Representatives reports any resolution relating to any such rule or regulation, it is at any time thereafter in order (even though a previous motion to the same effect has been disagreed to) to move to proceed to the consideration of the resolution. The motion is highly privileged and is not debatable. An amendment to the motion is not in order, and it is not in order to move to reconsider the vote by which the motion is agreed to or disagreed to. The Commission may not prescribe any rule or regulation which is disapproved by either such House under this paragraph.

(3) For purposes of this ·subsection, the term "legislative days" does not include any calendar day on which both Houses of the Congress are not in session.

(4) For purposes of this subsection, the term "rule or regulation" means a provision or series of interrelated provisions stating a single separable rule of law.

Under § 438(c), prior to prescribing any rule or regulation the Commission must transmit a statement explaining and justifying the proposed rule or regulation to one or both Houses of Congress. Rules or regulations respecting senatorial elections must be referred to the Senate, those respecting elections to the House to that body, and rules affecting elections to both Houses or election of the President must be referred to both Houses. If the body receiving such a statement does not disapprove the proposed rule or regulation by simple resolution (majority vote of a quorum) within 30 legislative or sitting days after receipt of the statement, the Commission may prescribe the rule or regulation. The Commission may not

prescribe, however, any rule or regulation which has been disapproved. As indicated above, when rules are lying before a single House of Congress, a legislative day is any calendar day on which that body is in session. With respect to rules or regulations lying before both Houses, a legislative day is any calendar day on which both Houses are in session. Any provision or series of interrelated provisions stating a single separable rule of law is a rule or regulation.

Sections 9009(c) and 9039(c) are virtually identical in their terms to § 438(c) *supra.* Since they relate respectively to Commission rules and regulations regarding public financing of (1) *general elections for President and presidential nominating conventions*, and (2) presidential primaries, it is not surprising that both sections require that rules or regulations subject to review thereunder must lie before both Houses and be subject to disapproval by either House. This requirement provides the same treatment for public financing matters that would be given to any rule or regulation under § 438(c) regarding election of the President.

To reiterate, rules and regulations reviewable under §§ 9009(c) and 9039(c) must lie before both Houses, whereas rules or regulations reviewable under § 438(c) might affect elections to one House only, and therefore have to lie before that House alone. But respecting the unicameral veto, all three provisions are identical: any rule or regulation, whether lying before one House or both, can be disapproved by a majority vote of a single House of Congress.

In the instant case, however, all rules and regulations generated by the Commission since its reconstitution and referred by it to the Congress have been put before both Houses (no party to this proceeding challenges the dual submission as to all rules and regulations), so the measure of "legislative days" elapsed is narrowed to a reckoning of the calendar days since August 3, 1976 on which both the House and the Senate have been in session.

2. The Federal Election Campaign Act, as amended (FECA), consists of the Federal Election Campaign Act of 1971, Pub.L. No. 92–225, 86 Stat. 3, as amended by the FECAA of 1974 and the FECAA of 1976, *supra* note 1. It has now been codified as Chapter 14, Title 2, United States Code.

2 U.S.C. § 437h establishes an unusual judicial review provision. As amended by the FECAA of 1976 it provides in full:

**§ 437h. Judicial review**

(a) The Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President of the United States may institute such actions in the appropriate district

addition, a three-judge District Court was convened to deal with allegations in the complaint regarding Subtitle H of the Internal Revenue Code of 1954, the provisions establishing public financing of presidential elections.[3] We have concluded, after care-

court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act. The district court immediately shall certify all questions of constitutionality of this Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc.

(b) Notwithstanding any other provision of law, any decision on a matter certified under subsection (a) shall be reviewable by appeal directly to the Supreme Court of the United States. Such appeal shall be brought no later than 20 days after the decision of the court of appeals.

(3) It shall be the duty of the court of appeals and of the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of any matter certified under subsection (a).

By precedent established by this court in *Buckley v. Valeo*, 171 U.S.App.D.C. 168 and 172, 519 F.2d 817 and 821 (1975), and not disturbed by the Supreme Court, 424 U.S. 1, 9–10 n.6, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), constitutional challenges to the provisions of Subtitle H, *infra* note 3, are also heard and determined by this court *en banc* under § 437h.

In the District Court and in this court various parties have urged procedural clarification, by which is meant departure from this *Buckley* precedent. It is argued that § 437h must now be read to require the District Court to make a finding that a "case or controversy" exists prior to making certification under that provision. Neither Judge Corcoran in *Buckley* nor Judge Richey in the instant case chose to do so. Given the statute's language regarding expedition and the settled precedent, we see no need to impose such a requirement. A District Judge requested to make certification under § 437h should be free to dismiss for want of jurisdiction, or to permit that question to be decided by this court *en banc*, much as a single judge asked to seek convening of a three-judge court under 28 U.S.C. § 2284 may determine threshold jurisdictional questions himself or herself, or call for such a court and allow that court to decide the matter. We similarly see no reason to disturb precedent with respect to the overlap of constitutional review by this court *en banc* and a three-judge court convened pursuant to 26 U.S.C. § 9011(b), *infra* note 3. Should a complaint be so narrowly focused as to reach only Title 2 matters, or only Title 26 matters, it might be appropriate for constitutional questions to be referred to a Court of Appeals *en banc* only, or to a three-judge court only; but where a complaint attacks statutory provisions in both Title 2 and Title 26, the *Buckley* prece-

dent provides the surest path to rapid decision and Supreme Court review.

The five constitutional questions certified to this court are:

1. Does this action challenging the constitutionality of § 315(c) of the Federal Election Campaign Act (FECA), 2 U.S.C. § 438(c), and §§ 9009(c) and 9039(c) of Subtitle H of Internal Revenue Code of 1954, 26 U.S.C. §§ 9009(c) and 9039(c), present a justiciable case or controversy under Article III of the United States Constitution?

2. Do 2 U.S.C. § 438(c), and 26 U.S.C. §§ 9009(c) and 9039(c), which allow a single House of Congress to disapprove rules and regulations, or selected portions thereof, adopted by the Federal Election Commission, violate the principles of separation of powers and checks and balances established by Articles I, II, and III of the Constitution; are they in derogation of the Presidential veto power in Article I of the Constitution; and are they in excess of the legislative powers enumerated in Article I of the Constitution?

3. Do the challenged provisions specified in questions one and two violate the right of a candidate for Federal office to Due Process of Law under the Fifth Amendment of the United States Constitution by: a) depriving him of the right to have laws affecting him enacted by the full legislative process, including passage by both Houses of Congress with the opportunity for a Presidential veto; and, b) invidiously discriminating against him in allowing incumbent officeholders, but not challengers, to veto rules and regulations of the Commission?

4. Do the challenged provisions violate the Constitution by delegating the discretion to disapprove regulations of the Federal Election Commission to a single House of Congress without fixing any standards or criteria to govern the exercise of such discretion and without requiring any statement of reasons for the exercise of such discretion?

5. Do the challenged provisions, by allowing a single House of Congress to disapprove rules and regulations, or selected portions of such rules and regulations, adopted by the Federal Election Commission, create an extra-Constitutional legislative process in violation of Article I of the United States Constitution[?]

3. This three-judge court was convened according to 28 U.S.C. § 2284 pursuant to 26 U.S.C. § 9011(b) as to matters within the purview of Chapter 95 of Subtitle H, including the challenged review provision, § 9009(c), and pursuant to 28 U.S.C. § 2282 as to matters within Chapter 96 of Subtitle H, including challenged review provision § 9039(c). The propriety of

ful review of the stipulated facts and the legal arguments tendered, that the matter before us does not present a ripe "case or controversy" within the meaning of Article III. We therefore return the certified questions to the District Court unanswered, with instructions to dismiss.

While this case presents many novel and thorny jurisdictional questions under Article III, we believe we need not address those pertaining to standing or political question, because the unripeness of the action is so pervasive.

■ As to plaintiff Clark, we are hard put to find any ripe injury or present "personal stake" in whether or how rules, regulations, and advisory opinions of the Commission are reviewed by the legislature. Any ripe nexus arising out of Clark's position as a senatorial candidate vanished when he failed of nomination. As a voter Clark protested no specific veto action taken by the Congress and identified no proposed regulation tainted by the threat of veto on review. Nor does he suggest that facial provisions of the Act inhibit his political activities as a voter in any way. It may well be that the facial provisions of the Act, if and when implemented, might in some way inhibit his rights as a voter. On this record, however, we must dismiss his present claim as unripe.

■ The court learned at oral argument that the United States, speaking through the Department of Justice, believes the appropriate test for survival of its complaint in intervention, should Clark be dismissed, is whether it has any independent jurisdictional basis on which to bring suit. We need not decide that question, for it is clear that the sole claim asserted by the United States is also unripe.[4]

The unconstitutionality complained of by the United States is that the challenged review provisions permitting disapproval of

this action was dictated by the *Buckley* precedent, *see* note 2 *supra*, and is not disturbed by the repeal of § 2282, Pub.L. No. 94–381, § 2, 90 Stat. 1119, because § 7 of the repeal bill is a savings clause which provides in full: "This Act shall not apply to any action commenced on or before the date of enactment." *Id.* at 1120. This action was commenced on July 1, 1976, and the repeal did not become effective until August 12, 1976. Future challenges to Subtitle H on constitutional or construction grounds may be hampered by the fact that, while § 9011(b) exists to provide expedited review as to Chapter 95, no parallel provision exists covering Chapter 96, and the approach taken by this court in *Buckley*, application of § 2282, will no longer be available. Congress may decide to remedy this gap in judicial review by amendment.

Section 9011(b) provides in full:

**(b) Suits to implement chapter.**

(1) The Commission, the national committee of any political party, and individuals eligible to vote for President are authorized to institute such actions, including actions for declaratory judgment or injunctive relief, as may be appropriate to implement or contrue [*sic*] any provision of this chapter.

(2) The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this subsection and shall exercise the same without regard to whether a person asserting rights under provisions of this subsection shall have exhausted any administrative or other remedies that may be provided at law. Such proceedings shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28, United States Code, and any appeal shall lie to the Supreme Court. It shall be the duty of the judges designated to hear the case to assign the case for hearing at the earliest practicable date, to participate in the hearing and determination thereof, and to cause the case to be in every way expedited.

4. The District Court granted the motion of the United States to intervene pursuant to Rule 24(b)(2), Fed.R.Civ.P., on behalf of "the entities represented by the United States, namely the President of the United States and the Executive Branch of the federal government." Defendant Valeo argues that the United States was improperly granted permissive intervention to attack the constitutionality of Acts which other federal parties appear here to defend: "The Department of Justice does not, of course, represent the interests of the three named defendants—the Senate, the House or the executive branch agency, the Federal Election Commission." Br. at 25. Because we dismiss this action on the ground of unripeness, we find it unnecessary to resolve the question of the propriety of the appearance of the United States, not to represent the unified position of all three coordinate branches, but to argue for a judicial declaration of unconstitutionality of an act of Congress in the interest of the President and Executive Branch alone.

rules or regulations by simple resolution (majority vote) of a single House of Congress "impermissibly intrude upon those areas reserved by the Constitution of the United States to the Executive Branch * * *." Complaint in Intervention at 3, ¶ 10. This claim is expressed at Paragraph 17 as a violation of the separation of powers. More specifically, Paragraph 18 states: "The one-house veto provisions illegally and unconstitutionally permit the evasion of the Presidential veto requirements of Article I, § 7, clauses 1, 2 and 3 of the United States Constitution." Subsequent paragraphs argue that this amounts to an unconstitutional delegation of legislative power from the full Congress to a single body, giving that single body more than plenary legislative powers, depriving the President and the Executive Branch of their full powers, and permitting either House of Congress to separately perform legislative acts.

Significantly, the United States did not claim that the regulations which were propounded and referred and recently lay before Congress under the challenged review provisions are tainted with political interference. Rather, its claim is that review of Commission regulations and possible veto by a single House, without participation of the other House or the President, deprives the President of his veto power with respect to legislation. The difficult question whether legislative review of regulations constitutes legislation to which the presidential veto necessarily applies also need not be reached in these proceedings because of the unripeness of a challenge based upon the veto power.

The challenged review provisions are really of two parts; the first is constitutionally permissible, and only the second is arguably constitutionally suspect.[5] The first element of legislative review envisioned by the challenged Acts requires that when the Commission has settled upon final drafts of rules or regulations embodying the Commission's interpretation or extrapolation of the statutes, those rules or regulations may not become immediately effective, but must instead lie before the Congress for a period of time during which the Congress may act to disapprove the regulations. If the statutory scheme for review stopped there, it would be presumptively constitutional under *Sibbach v. Wilson & Co.,* 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941), which stands for the principle that a lying-over provision which delays the effectiveness of an otherwise valid rule or regulation in order to permit Congress to take negative action is not of itself unconstitutional.[6] In *Sibbach*

---

**5.** It may be argued, of course, that the statutes providing for a lying-over period and a one-house veto constitute a unitary statutory scheme and that the parts thereof are not severable. Such an argument, however, ignores the fact that the two parts of the statutes are indeed discrete with the first part of each effectively indistinguishable from the statute in *Sibbach v. Wilson & Co.,* 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941). Certainly, no illegality would result from passage of plenary legislation during the lying-over period required by these statutes. And of course there is nothing to prohibit the Congress from using the lying-over period for this purpose rather than the one-house veto. *See Buckley v. Valeo, supra* note 2, 171 U.S.App.D.C. at 229, 519 F.2d at 878.

**6.** In dissent Judge MacKinnon argues that the lying-over provision in the statute to allow Congress time to veto Commission regulations makes the regulations ripe for review:

The point is that the congressional veto scheme, whether exercised or not, makes Congress a working party in the executive functioning of the agency, impinges upon the free judgment of the Commission, and necessarily operates to make the Commission subservient to views that may be communicated directly or indirectly from Congress, to such an extent that an agency that is held out as being free to regulate federal elections in the public interest is actually obstructed in that task by some of the parties its regulations are supposed to govern.

MacKinnon dissent at ———— of 182 U.S. App.D.C., at 679–680 of 559 F.2d. Judge MacKinnon distinguishes *Sibbach*:

If the only provision for review were the lay-over provision with the possibility of subsequent legislation (as in *Sibbach v. Wilson,* 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941)), then the regulations would become effective unless both houses of Congress disapproved, and the President signed their alternative legislation. If he vetoed the congressional action it would take a two-thirds vote of both houses to impress the congressional will upon the Commission's action. That is the nature and extent of the influence assigned

it was assumed that the appropriate negative action by Congress during the lying-over period for the Federal Rules of Civil Procedure would be plenary legislation: the adoption of an Act or Joint Resolution suspending the operation of all or some portion of the proposed Rules. When the expression of negation takes the form of plenary legislation, of course, presidential participation is necessary, and no derogation of presidential prerogative in violation of separation of powers appears.

In the instant case, however, the statutes in suit contemplate that the expression of negation during the 30-legislative-day lying-over period (the second part of the review scheme) may be by simple resolution of one House only—the unicameral or one-house veto. It is this aspect of the federal election laws' legislative review scheme that is strongly challenged. However, it is only the first part of the scheme that has come into play; the clock had run for 28 legislative days when the 94th Congress adjourned *sine die*.[7] The challenged part, adoption of a simple resolution of disapproval by either House, has not occurred.

If the Commission were to resubmit these same regulations to the 95th Congress, and if the lying-over period expired without any legislative activity, the Commission would then be free to promulgate the proffered regulations, and no presidential prerogative whatever would have been violated. For this reason we hold that this matter is not justiciable on the ground of unripeness with respect to the claim of the United States.[8] Until Congress exercises the one-house veto, it may be difficult to present a case with sufficient concreteness as to standing and ripeness to justify judicial resolution of the pervasive constitutional issue which the one-house veto provision involves. *See* note 10 *infra. See also* Appendix A *infra.*

■ This case has proceeded through the District Court and this court on an expedited schedule with abbreviated briefing. As the Department of Justice notes, its central issue—the constitutional validity of a congressional disapproval device—"represents the continuation of a dispute of major constitutional proportions which has been

by the Constitution to Congress in the affairs of other agencies. The one-house veto scheme violently disturbs the constitutionally prescribed congressional-executive balance intended to apply in such situations. *Id.* at —, at 680 of 559 F.2d (footnote omitted). In Judge MacKinnon's view the extent of congressional influence is less under the statute in *Sibbach* than under the statute here. Thus to him the relevant difference between the lying-over provisions in the two statutes is one of degree rather than principle. This is particularly interesting since the lying-over period in *Sibbach* was six months, 312 U.S. at 7–8, 61 S.Ct. 422, whereas the lying-over period under the statute here is limited to 30 days.

7. Shortly after Congress adjourned the Commission sought and was granted leave to file a Statement which had been made available to candidates and the public through the press. It explains that, although the regulations did not technically become effective, they represent the "formally adopted views of the Commission" and should be taken as "an authoritative guide" to application of the election laws subject to Commission jurisdiction. We have no occasion now to consider the legal effect of such interpretive rules or of this adoptive announcement. But we believe its appearance does lend force to our ripeness and prudential rulings. One of plaintiff's contentions was that

one result of the absence of effective regulations, resulting from the consultative process and the spectre of legislative veto, was deprivation of guidance as to how to comply with FECA and Subtitle H. Similarly, it could have been argued, the public was deprived of campaigns conducted under clear guidelines. The Commission's issuance of the Statement means that both candidates and voters did receive and are receiving guidance as to the FEC's view of the meaning of these laws.

8. A contention that there are no real considerations of ripeness here can only rest on a view of the merits that a one-house veto is so patently unconstitutional that nothing more is needed to inform the judgment of the court. This view that the one-house veto is unconstitutional on its face demeans Justice White's analysis in *Buckley.* There Justice White found the provision *constitutional* on its face. 424 U.S. at 284–286, 96 S.Ct. 612. Be that as it may, a proper record compiled in an appropriate adversary proceeding with briefing of the issue worthy of its importance would certainly assist a court in resolving this important constitutional question. *See* note 10 *infra.*

*See* Appendix A *infra* for an analysis of the Supreme Court's opinion in *Buckley* vis-à-vis our own on the issue of ripeness for decision.

brewing for forty years." [9] No good reason appears why, in the circumstances of this case, this court should now strain to exercise its jurisdiction to resolve this momentous political as well as legal problem. *Compare Samuels v. Mackell,* 401 U.S. 66, 73, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971). Neither plaintiff nor intervening plaintiff has presented a ripe justiciable "case or controversy" which would permit this court to reach and decide the merits of the constitutional questions respecting a unicameral veto of Commission regulations.[10] The certified questions are returned to the District Court unanswered, and the District Court is instructed to dismiss the case.[11]

*So ordered.*

WILKEY, Circuit Judge, concurs in the result.

[9] *See* Reply to Defendants' Oppositions to Motion of United States to Intervene at 1–2. *See also* note 10 *infra.*

[10] Were this court to decide the threshold "case or controversy" questions differently, it would nevertheless refuse to reach the merits of the unicameral veto under the doctrine of judicial prudence enunciated in *Samuels v. Mackell,* 401 U.S. 66, 73, 91 S.Ct. 764, 27 L.Ed.2d 688 (1973). Clearly, the question of legislative review of Executive and administrative agency actions is a sweeping subject to be treated in a gingerly fashion by the courts. Review of various legislative review mechanisms ought at an absolute minimum to be informed by experience and not depend solely on abstract analysis or speculation. A court should know a great deal more about what a unicameral disapproval device means in practice, and how it differs in congressional "control" from the relationship between a funded agency and members of relevant appropriations subcommittees. A constitutional decision might better await an attack upon legislative review by the entity subject to such review, which could be informed by the testimony of those who felt constrained to withhold proposals because of veto indications from the reviewing authorities. Those more intimately involved with the problem than the plaintiff and intervening plaintiff herein might better assist a court to determine whether the unicameral veto is really a violation of, or perhaps might be a furtherance of, the objective of pragmatic government that combines checks and balances with the principle of coordination between branches. That might be the wisdom of studying the whole issue in a concrete setting, of regulations rejected or clearly trimmed in advance of submission, and not reaching the issue in a case which presented a bare "case or controversy." Thus even were the court to find that Article III's strictures were met by this action, a finding we expressly reject, we would be impelled to exercise discretion and refuse to decide this case.

The existence of nearly 200 other legislative review provisions has been cited to us, both to impress upon us the landmark proportions of this matter and to urge extreme caution lest we paint with too broad a brush. Norton, *Congressional Review, Deferral and Disapproval of Executive Actions: A Summary and an Inventory of Statutory Authority* (Cong. Research Service, Library of Congress, Apr. 30, 1976), p. i. It must be noted that both subtle and substantial differences in procedure abound among the various mechanisms for legislative review of Executive and administrative agency action.

[11] Judge Robinson's dissent, insofar as it argues that this case is ripe for adjudication, is primarily predicated on the assumption alleged by plaintiff that the presence of the unexercised one-house veto provision in the statute tends to force the Commission to tailor its proposed regulations to avoid veto. As we show in text at pp. ————— of 182 U.S.App. D.C., at 669–671 of 559 F.2d *supra,* the first step in the legislative veto procedure provided in the statute is indistinguishable from the first step in the legislative procedure approved in *Sibbach v. Wilson & Co., supra* note 5. "The 'taint' of this Damoclean congressional purview" there was the same as here. Robinson dissent at ——, at 672 of 559 F.2d. Thus, were we required to decide this case now on the primary issue raised in support of ripeness, we might also be required to follow *Sibbach* in holding that providing time for legislative review before a regulation goes into effect does not make the statute unconstitutional. This we refuse to do, at least until we see more of the statute in operation and are provided with a record and briefs appropriate for consideration and resolution of the important constitutional issue presented. Only then will this case be "fit for judicial resolution." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 153, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

Judge Robinson's dissent states that § 437h of the Act imposes "constraints on judicial recourse to the ripeness doctrine so long as there was a case or controversy within the meaning of Article III," Robinson dissent at —— of 182 U.S.App.D.C., at 668 of 559 F.2d, and that "Section 437h is both an endowment of exceptional judicial power and a command to use it in litigation attacking the constitutionality of any provision of the Act. The grant is coextensive with the constitutional maximum of adjudicative authority, observing no limit save the existence of a case or controversy. The mandate to the judiciary is equally apparent: con-

## APPENDIX A

The Supreme Court in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), correctly noted that this court had held unripe for resolution constitutional attacks upon five powers delegated to the Federal Election Commission by statute (including the power to make rules subject to lying-over and one-house veto). Thus this court in Buckley limited its constitutional analysis to the propriety of the Commission, as then appointed, exercising those powers respecting which there was record evidence of exercise. As to those found to be exercised, they were determined to be powers properly delegated to a constitutionally appointed legislative commission. The rule-making power then being unexercised, the challenge to it was deemed unripe.

The Supreme Court's approach was fundamentally different. Focusing upon the full panoply of delegated powers, the Court essayed to determine what method of appointment was necessary for a body exercising *all* such powers, and determined that the Commission, as then appointed, could not exercise them without running afoul of Art. II, § 2, cl. 2. The Court likewise noted that circumstances had changed since this court's opinion, as the Commission had undertaken to issue rules and regulations under authority of Section 438(a)(10). It further stated that, while

> many of [the Commission's] other functions remain as yet unexercised, the date of their all but certain exercise is now closer by several months than it was at the time [of the Court of Appeals' ruling]. Congress was understandably most concerned with obtaining a final adjudication of as many issues as possible litigated pursuant to the provisions of § 437h. Thus, in order to decide the basic question whether the Act's provision for appointment of the members of the Commission violates the Constitution, we believe we are warranted in considering all of those aspects of the Commission's authority which have been presented by the certified questions.

424 U.S. at 116–117, 96 S.Ct. at 681.

That said, it is useful to examine the circumstances pertaining to exercise of the one-house veto at the time of the Court's consideration of *Buckley* and its treatment of Certified Question No. 8(d), which directly asked the constitutionality of Section 438(c).[1] *Buckley* was argued to this court *en banc,* sitting jointly with the three-judge District Court, on June 13, 1975. After its submission the Commission, on July 10, 1975, referred to both Houses of Congress regulations that would have subjected con-

---

stitutional questions emerging are to be decided if only their determination is possible in the *constitutional sense." Id.* at ——, at 669 of 559 F.2d. To the extent this language may be read as suggesting a view that Congress may "command" the judiciary to act contrary to the rules relative to ripeness the Supreme Court has developed "for its own governance in the cases confessedly within its jurisdiction," *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346, 56 S.Ct. 466, 482, 80 L.Ed. 688 (Brandeis, J., concurring), we respectfully disagree. *See United States v. Congress of Industrial Organizations,* 335 U.S. 106, 124–125, 68 S.Ct. 1349, 92 L.Ed. 1849 (Frankfurter, J., concurring). *See also Regional Rail Reorganization Act Cases,* 419 U.S. 102, 138, 95 S.Ct. 335, 356, 42 L.Ed.2d 320 (1974):

> All of the parties now urge that the "conveyance taking" issues are ripe for adjudication. However, because issues of ripeness involve, at least in part, the existence of a live "Case or Controversy," we cannot rely upon concessions of the parties and must determine whether the issues are ripe for

decision in the "Case or Controversy" sense. Further, to the extent that questions of ripeness involve the exercise of judicial restraint from unnecessary decision of the constitutional issues, the Court must determine whether to exercise that restraint and cannot be bound by the wishes of the parties. (Footnotes omitted.)

1. 8. Do the provisions in the challenged statutes concerning the powers and method of appointment of the Federal Election Commission violate the rights of one or more of the plaintiffs under the constitutional separation of powers, the First, Fourth, Fifth, Sixth, or Ninth Amendments, Article I, Section 2, Clause 6, Article I, Section 5, Clause 1, or Article III?

\* \* \* \* \* \*

(d) Does 2 U.S.C. § 438(c) violate such rights, in that it empowers the Federal Election Commission to make rules under the FECA in the manner specified therein?

tributions to and expenditures from the office accounts of federal officeholders to FECA's strictures and limitations. Following discussion between the Commission and at least one member of Congress and congressional staff, the regulations were redrafted and resubmitted on September 30, 1975. After hearings the Senate Committee on Rules and Administration submitted its report and a resolution, S. Res. 275, to disapprove both drafts of the regulations. An amendment to the resolution effectively approving the second draft was defeated on the floor by one vote, and then, on October 8, 1976, S. Res. 275 disapproving both drafts was agreed to.

Meanwhile, another skein of regulations—governing the place-of-first-filing for reports required under the disclosure provisions of FECA—suffered a similar fate in the House of Representatives. On August 1, 1975 regulations requiring first filing of contribution and expenditure reports with the Commission itself were referred to both Houses. Discussion between the FEC chairman and the chairman of the Committee on House Administration ensued. On October 22, 1975 the House adopted its simple resolution, H.Res. 780, disapproving these document-filing regulations.

On November 10, 1975 *Buckley v. Valeo* was heard by the Supreme Court.

Second and third versions of the document-filing regulations were referred to both Houses on December 2, 1975. Additional proposed regulations were referred on December 3, 1975 and January 19, 1976.

Thus, unlike the situation. before this court, when the Supreme Court decided *Buckley* on January 30, 1976, not only were there regulations lying before both Houses (those listed in the paragraph above) still subject to one-house veto, but also such veto had been twice exercised against regulations referred by the extant Commission. Nevertheless, the Court exercised discretion and limited its review in such a way as to avoid passing on the question of the propriety of the one-house veto contained in Question 8(d)'s challenge to Section 438(c):

Appellants make a separate attack on this qualification of the Commission's rulemaking authority, which is but the most recent episode in a long tug of war between the Executive and Legislative Branches of the Federal Government respecting the permissible extent of legislative involvement in rulemaking under statutes which have already been enacted. * * * Because of our holding that the manner of appointment of the members of the Commission precludes them from exercising the rulemaking powers in question, we have no occasion to address this separate challenge of appellants.

424 U.S. at 140 n.176, 96 S.Ct. at 692 n.176.

The Court even refrained from discussing the propriety of delegating this power to make rules (subject to lying-over and one-house veto) to the properly reconstituted Commission that its opinion implicitly called for:

Thus, on the assumption that all of the powers granted in the statute may be exercised by an agency whose members *have been* appointed in accordance with the Appointments Clause,[175] the ultimate

[175] Since in future legislation that may be enacted in response to today's decision Congress might choose not to confer one or more of the powers under discussion to a properly appointed agency, our assumption is *arguendo* only. Considerations of ripeness prevent us from deciding, for example, [the question of candidate disqualification]. With respect to this and other powers discussed *infra*, this page and 138–141, 96 S.Ct. 612, we need pass only upon their nature in relation to the Appointments Clause, and not upon their validity *vel non*.

question is which, if any, of those powers may be exercised by the present voting Commissioners, none of whom *was* appointed as provided by that Clause.

*Id.* at 137 & n.175, 96 S.Ct. at 690 & n.175 (emphasis in original).

Either the Court decided, as a matter or prudence, to postpone review "of the validity *vel non*" of Section 438(c) until another day, where it would arise in the context of even more concrete facts than those obtaining in *Buckley*, or it was saying that there was then insufficient injury and "personal

stake" to make that question reviewable under Section 437h. The *Buckley* Court was willing to address far-reaching separation of powers questions with respect to the Appointments Clause without touching the acknowledged separation of powers questions inherent in the legislative review provisions.

This court had determined that Question 8(d) was unripe for review, strongly suggesting that the constitutionality of Section 438(c) was indeed a proper question for adjudication under review provision Section 437h when presented in the context of sufficiently concrete and adverse claims. The Supreme Court, which considered *Buckley* after the Commission had referred several skeins of regulations under Section 438(a)(10), after there had been redrafting and resubmission following discussions between the Commission and Congress (the arguable or alleged taint of these regulations), and after both Houses had each rendered a unicameral veto under Section 438(c), nonetheless refused to answer Question 8(d). Given that posture then, and the facts of the instant case—in which there was no exercise of the unicameral veto and now no live regulations subject to veto—it seems fair to say that the separation of powers questions inherent in Section 438(c) were more starkly presented by the facts obtaining in *Buckley* when the Court considered it. If this question is now properly brought under Section 437h even in the absence of exercise of veto, why was it not so in *Buckley*, where the Supreme Court refused to adjudicate it?

The answer cannot lie wholly in the changed appointment of the Commission, for the Court's opinion actually permitted the regulations lying over when *Buckley* came down to be unicamerally vetoed, or promulgated after escaping veto. After determining that the admixture of the Commission's method of appointment and statutorily delegated powers violated the Constitution, the Court did not void all prior actions of the Federal Election Commission, but instead held "that the Commission's inability to exercise certain powers because of the method by which its members have been selected should not affect the validity of the Commission's administrative actions and determinations" through the date of the Court's opinion. 424 U.S. at 142, 96 S.Ct. at 693. "The past acts of the Commission are therefore accorded *de facto* validity * * *." *Id.*

Thus the regulations referred and lying over as of the date of the Court's opinion were properly referred. Further, the Court stayed "for a period not to exceed 30 days" —and later extended for 20 days more— "the Court's judgment insofar as it affects the authority of the Commission [prospectively] to exercise the duties and powers' granted it under the Act." *Id.* at 143, 96 S.Ct. at 693. Therefore, Congress remained free after *Buckley* to veto the pending regulations unicamerally, and at the same time the Commission remained free (for the duration of the stay) to promulgate any regulations which survived the lying-over period. That the Court's *Buckley* decision left this power in the Commission during the pendency of the stay is recognized by Finding of Fact 45 in the instant case:

45. The Commission decided, after the decision in *Buckley v. Valeo*, that, even though the thirty legislative days had passed since the regulations were submitted to Congress and no resolution of disapproval had been passed, it would be inappropriate for the Commission to prescribe any regulations prior to Congressional action on bills then pending to reconstitute the Commission as an independent agency.

The Supreme Court's forbearance from deciding Question 8(d) in *Buckley* even on the facts then presented, should guide this court with respect to the concreteness of adversity required for decision. To suggest that the constitutionality of Section 438 must be determined now, simply because it has been raised under Section 437h by a person eligible to vote for President of the United States in any election, appears to fly in the face of the outcome in *Buckley*.

TAMM, Circuit Judge, with whom BAZELON, Chief Judge, and J. SKELLY WRIGHT, Circuit Judge, join, concurring.

Although I agree with the reasoning of the court's per curiam opinion ordering a

dismissal of this case for lack of ripeness, I wish to add a few words concerning the claim of the United States to participate in this litigation as a party with independent standing. Nothing in our decision today should be taken as an approval of the sweeping claim of the United States that in the absence of both a statutory authorization to sue and an articulated injury to an interest of the federal government as a whole, it nonetheless can come into court and challenge the actions of one branch of the federal government as an unconstitutional invasion of the powers of another branch.

The United States of course relies on *In re Debs*, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895) and its progeny. These cases are readily distinguishable from the case at hand. The broad language in *Debs*, referring to the right of the Government to seek assistance from its own courts in advancing the general welfare, was included to refute the argument that the Government had to show a pecuniary interest before it could bring suit. *See In re Debs, supra*, 158 U.S. at 584, 15 S.Ct. 900. Moreover, the *Debs* Court specifically noted that the duty on which the standing of the United States rested arose not simply from the constitutional grant of power to regulate commerce but from congressional action expressly assuming and implementing that power. *Id.* at 586, 599, 15 S.Ct. 900. In this case the Government does not refer us to any statutory scheme implementing a constitutional grant of power from which there arises, either expressly or impliedly, a duty of the United States to protect one branch of the federal government from another.

The only injury alleged by the Government here is a conflict of views between the Executive and Legislative branches of the federal government as to the constitutional prerogatives of the Executive. At oral argument the Government characterized this injury as an infringement of the Constitu-

tion which it has an interest in protecting arising from its constitutional duty to take care that the laws are faithfully executed. Not only does this argument assume a role for the Executive as the "protector of the Constitution", but it also presupposes a decision on the merits of this suit. Whether the statutory provisions the Government seeks to challenge do or do not infringe on the constitutional powers of the President remains a question for the courts to decide, not the Executive. The most the Government can allege in this case is that it seeks to defend the President's view of what the Constitution requires.[1]

In its brief the Government cites *New York Times Co. v. United States*, 403 U.S. 713, 741–42, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (Marshall, J., concurring), *United States v. ICC*, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949), and *United States v. California*, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947), as additional support for its claim of standing. In *New York Times* the Government sought to enjoin the publication of a classified report about the conduct of the Vietnam war on the grounds that publication would damage the national security of the United States. Justice Marshall, in his concurring opinion, first noted the broad powers of the President by virtue of his constitutionally-delegated primary responsibility for the conduct of foreign affairs, 403 U.S. at 741, 91 S.Ct. 2140, and then commented that

> in some situations it may be that under whatever inherent powers the Government may have, as well as the implicit authority derived from the President's mandate to conduct foreign affairs and to act as Commander in Chief, there is a basis for the invocation of the equity jurisdiction of this Court as an aid to prevent the publication of material damaging to "national security" . . . .

---

**1.** The President may have standing to challenge a statute which allegedly infringes his constitutional authority to veto legislation. *Cf. Kennedy v. Sampson*, 167 U.S.App.D.C. 192, 511 F.2d 430 (1974). The Attorney General, however, does not claim participation in this suit as counsel for the President, but argues that the United States is a party with independent standing.

*Id.* at 742, 91 S.Ct. at 2155. The Constitution does not give the President any duty to protect the Constitution from allegedly unconstitutional legislation comparable to his self-executing mandate to conduct foreign affairs. Moreover, the alleged injury to "national security" in *New York Times* was clearly an injury to the United States as a whole, its government and its people.

In *United States v. ICC, supra,* the United States filed suit to challenge an order of the Interstate Commerce Commission which had denied the Government's claim for damages from allegedly unlawful railroad rates. The United States, however, was also made a defendant by statute in any action to set aside an order of the ICC. *See United States v. ICC, supra,* 337 U.S. at 429, 69 S.Ct. 1410. The Supreme Court reversed the dismissal of the Government's suit by a three judge district court, reasoning that the Government, like any other shipper, was free to litigate the legality of sums of money exacted from it by railroads, and that nothing in the statute which made the United States a defendant in actions challenging ICC orders indicated a congressional purpose to amend existing statutes empowering the Attorney General to seek judicial redress for the Government. *Id.* at 430–32, 69 S.Ct. 1410. Neither of the grounds for the United States' presence as a party in *United States v. ICC* supports its claim of standing in this case. Here there is no claim of "injury in fact" to the United States as a whole comparable to illegally exacted shipping charges, and there is no statute authorizing its participation as a party.

The Government's reliance on *United States v. California, supra,* is equally unavailing. In that case the United States filed suit to enjoin California and its lessees from trespassing on offshore lands over which the United States claimed fee simple ownership. 332 U.S. at 22–23, 67 S.Ct. 1658. Although the Court rejected the de-

fendants' argument that the Attorney General had no authority to bring the suit, it did so on the basis that Congress had not restricted the existing statutory authority of the Attorney General to safeguard government rights and properties by instituting litigation. *Id.* at 27–29, 67 S.Ct. 1658. Moreover, the alleged infringement of property rights by California in that case was clearly an injury to the United States as a whole.

At oral argument the Government referred us to three other cases which it maintained also support its independent participation as a party in this case. *United States v. San Jacinto Tin Co.,* 125 U.S. 273, 8 S.Ct. 850, 31 L.Ed. 747 (1888); *Booth v. Fletcher,* 69 U.S.App.D.C. 351, 101 F.2d 676 (1938); *Brennan v. Buckeye Industries, Inc.,* 374 F.Supp. 1350 (S.D.Ga.1974). I cannot agree.

In *San Jacinto* the United States sued to set aside a land patent issued by the United States on the grounds that it was based on a fraudulent survey.[2] *San Jacinto, supra,* 125 U.S. at 274–75, 8 S.Ct. 850. San Jacinto asserted that the Attorney General had no general authority to sue in the name of the United States to set aside a patent. The Court disagreed but treated the issue as a question of the authority of the Attorney General, rather than standing of the United States. *See id.* at 278–85, 8 S.Ct. 850. The Court's opinion clearly indicates, however, that the standing of the United States depended on a showing of injury in fact sufficient to give it a stake in the outcome of the litigation greater than a generalized interest in the success of a particular legal or constitutional argument.

But we are of opinion that since the right of the government of the United States to institute such a suit depends upon the same general principles which would authorize a private citizen to apply to a court of justice for relief against an

---

2. The Commissioner of the General Land Office in Washington, the Surveyor General and two of his employees were all part owners of the land claimed under the challenged patent. The Government alleged that they had intentionally misrepresented the location of the claim in order to cheat the United States out of valuable mineral ores. *See San Jacinto, supra,* 125 U.S. at 277–78, 8 S.Ct. 850.

instrument obtained from him by fraud or deceit, or any of those other practices which are admitted to justify a court in granting relief, the government must show that, like the private individual, it has such an interest in the relief sought as entitles it to move in the matter.

. . . . .

In all the decisions to which we have just referred it is either expressed or implied that this interest or duty of the United States must exist as the foundation of the right of action.

*Id.* at 285–86, 8 S.Ct. at 857. There is no injury alleged by the United States in this case which is comparable to the loss of mineral rights and other property interests which served as a basis for the United States action in *San Jacinto*. Moreover, there is nothing in the rationale of the *San Jacinto* opinion to justify the independent participation of the United States in a lawsuit as a "protector of the Constitution."

*Booth v. Fletcher, supra,* is inapposite to the Government's position in this case on both its facts and reasoning. In *Booth* the plaintiff challenged the participation of the Attorney General as counsel for judicial officers and Department of Justice employees whom he sought to sue in their "individual capacity" for their role in his allegedly unlawful disbarment. The case did not involve any question of the United States as a party to the suit and certainly not as a party plaintiff. The Attorney General merely claimed the authority to act as defense counsel for United States officers and employees being sued for actions "clearly within the scope of their authority." *Booth, supra,* 69 U.S.App.D.C. at 356, 101 F.2d at 681. Admittedly the court based its holding on a statute which authorized the Attorney General to appear in any case in which "he deems it for the interest of the United States", *id.,* and upon the finding that the United States has an interest in protecting its officers from retaliatory suits resulting from the proper performance of their duties. Even by analogy that reasoning is of no avail to the Government's claim of standing in this case, however. The interest of the United States is not having its agents deterred in the performance of their duties by the threat of personally defending costly court actions is clearly an interest shared by the United States as a whole and distinct from an interest in defending the theory of one particular branch of the federal government as to its constitutional prerogatives.

Like *Booth, Brennan v. Buckeye Industries, Inc., supra,* does not deal directly with the question of standing of the United States. In *Brennan* the defendant challenged neither the standing of the United States, which in any event was not a party to the suit, nor the standing of the Secretary of Labor, who was. The defendant's jurisdictional attack challenged the power of a federal court to entertain the proceeding brought by the Secretary, arguing that the specific provisions of the Occupational Safety and Health Act, 29 U.S.C. §§ 657(b), 662, 666(k) (1970) were exclusive and precluded reliance on the general grants of jurisdiction in sections 1337[3] and 1345[4] of title 28 of the *United States Code.* The district court found that "[n]othing in the Act under consideration limits or affects the applicability of § 1337 or § 1345." *Id.* at 1353. It then held that it did have jurisdiction because

[u]nless legislation should expressly provide that jurisdiction of a district court is

---

**3.** Section 1337 gives federal courts jurisdiction over "any civil action or proceeding arising under any Act of Congress regulating commerce . . . ." 28 U.S.C. § 1337 (1970). The Occupational Safety and Health Act is based on the declared purpose of Congress to regulate commerce so as "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions . . . ." 29 U.S.C. § 651 (1970).

**4.** Section 1345 provides:

Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress.

28 U.S.C. § 1345 (1970).

limited by the special jurisdictional provisions of an Act, the right of the United States to sue under § 1337 and § 1345 is not affected.

*Id.*

The Government's citation of *Brennan* in support of its standing claim in this case apparently refers to that court's comment that

[t]he absence of specific statutory authority for an action by the United States in a particular instance is no obstacle to original jurisdiction under § 1345.

*Id.* at 1352–53. In fact *Brennan* was concerned only with the question of the statutory basis for federal court jurisdiction to which section 1345 is directly applicable. Section 1345 is not relevant to the separate question of standing of the United States. It is merely a statutory expression of the Congress' constitutional power to define the jurisdiction of federal courts without which a federal court cannot entertain a suit regardless of how solidly a litigant establishes his standing. If the United States has the capacity and standing to bring a suit, then section 1345 gives the federal courts jurisdiction over that suit.

Of course, standing is also a jurisdictional issue, but one conceptually distinct from the issue addressed by section 1345. The need for a statutory basis for federal court jurisdiction derives from the fact that the first sentence of Article III of the Constitution[5] is not self-executing but rather depends on an affirmative congressional grant of jurisdiction. The question of standing is addressed to the constitutional and prudential concerns that a litigant show sufficient personal stake in the outcome of a suit to satisfy the case or controversy requirement of Article III.

In this action the Government has failed to allege any facts from which this court could find an injury in fact to the United States as a whole which would enable the United States to invoke the jurisdiction of a federal court. The court's per curiam states that it is unnecessary to decide the question of standing for the United States because the only claim presented by the United States is not ripe. I fully agree with the court's decision as to ripeness. I think that it is important to emphasize, however, that the court's silence on the issue of standing should not give rise to any inference that the United States could maintain this suit as an independent party.

LEVENTHAL, Circuit Judge, concurring:

I concur generally in the opinion of the court. As to the ruling on ripeness, on which I add some reflections, my joinder is based on the doctrine that ripeness or lack of ripeness may be rooted in prudential considerations analytically apart from, though often interrelated with, constitutional compulsions. I have serious doubts whether this action is ripe for adjudication in the constitutional sense, but should prefer not to voice a constitutional ruling. What seems to me plain is this, that on the record presented the court should exercise its discretion to withhold declaratory relief.

## I. RIPENESS CONSIDERATIONS

This case does not present the legal controversy with sufficient concreteness for a well-considered judicial decision.

The action was brought in July 1976 by Ramsey Clark, identified as an eligible voter and a candidate in the Democratic senatorial primary in New York. He sought judgment declaring the invalidity of sections of the Federal Election Campaign Act Amendments of 1974, 2 U.S.C. § 438(c) and 26 U.S.C. §§ 9009(c), 9039(c). These establish that regulations proposed by the Federal Election Commission will not become effective until they have lain before Congress for 30 legislative days, during which period a single house of Congress may disapprove the regulations. If the regulations have

---

**5.** The judicial power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.

U.S.Const. art. III.

not been disapproved by the appropriate action within 30 legislative days, "then the Commission may prescribe such rule or regulation." Subsequent to *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the statute was amended, *inter alia*, so as to specify that the voting members of the Commission shall be appointed by the President, subject to Senate confirmation. The newly constituted Commission proposed some regulations in the summer of 1976, but Congress adjourned prior to the expiration of the pertinent thirty-day period.

The central issue on the merits is whether it is consistent with our constitutional scheme to provide for disapproval of the Commission's regulations by an action short of a new statute, and specifically by resolution of one house of Congress.

The constitutional scheme, the Supreme Court has explained, reflects the framers' desires for both counteraction and cooperation between the major branches:

> The men who met in Philadelphia in the summer of 1787 were practical statesmen, experienced in politics, who viewed the principle of separation of powers as a vital check against tyranny. But they likewise saw that a hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively.

*Buckley v. Valeo*, 424 U.S. 1, 121, 96 S.Ct. 612, 683, 46 L.Ed.2d 659 (1976). Justice Jackson highlighted the inherent tension in the constitutional plan:

> While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity.

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952). In light of the dual purposes of the constitutional framework, any procedural innovation must be examined with close attention to its actual operation: do the specific ways in which it knits the branches together into a working coalition operate to undercut their independence?

To date, there has been no Congressional veto of regulations issued by the Executive-appointed Federal Elections Commission.[1] We do not know whether there will ever be such a veto or, if there should be one, what reasons would be given for such a veto, in what manner it would be exercised, or what institutional consequences would flow from it. We know, in short, very little about the operation of the mechanism which is at the heart of the lawsuit.

In *Buckley v. Valeo*, Congress had exercised the claimed power to appoint the members of the former Commission, and the Commission had begun to carry out some of the functions that were held to be non-legislative. The Supreme Court had a set of facts on the exercise of powers—by the Congress (appointments) and by the Commission (regulations). Here, we have no such specifics as to the exercise by Congress of the power claimed to be beyond its reach. In light of the relative novelty of the procedure questioned here, our need for facts would seem greater.[2]

---

1. The Senate and House of Representatives each exercised their veto power to block regulations proposed by the original Election Commission. However, a majority of the members of that Commission were appointed by Congress. In light of the greater independence of the Commission established by the 1976 Amendments, and the observations of the Supreme Court in *Buckley v. Valeo*, 424 U.S. 1, 120–137, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), Congress might well take a different approach to the regulations of the current Commission. For this reason, I do not think the earlier experience with the one-house veto is helpful in repairing the inadequacy of the current factual situation.

 In contrast, *Buckley* noted that the Commission had already undertaken to issue rules and regulations, and that the exercise of its remaining powers was "all but certain." 424 U.S. at 11, 96 S.Ct. 612.

2. The use of the simple resolution to control executive activities is largely a twentieth century development. *See* Watson, *Congress Steps Out: A Look at Congressional Control of the Executive*, 63 Calif.L.Rev. 983, ·995–1029 (1975). While in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Su-

A too-ready resolution of constitutional questions tends to put the discussion on an abstract level, and this in turn affects the result. One's view of the one-house veto issue may be affected, for example, if it should develop that Congress itself distinguished between regulations that are "interpretive," and therefore more aligned with the responsibility of the executive branch, and regulations that are "legislative," that implement or carry forward a statutory mandate in ways not specified by the statute, and with respect to which a more substantial congressional role might be proper.[3] The issue is not addressed in the legislative history of the 1976 amendment specifying that a Commission rule or regulation subject to legislative disapproval is one "stating a . . . rule of law."[4] Even for non-interpretive regulations, there may be a distinction in terms of the pertinent constitutional question between those that are merely ministerial, or fill in the working details of a reasonably specific standard in a statute, and those that reflect substantial policy choices. It may be relevant whether the house of Congress rejecting the proposed regulation states its reasons along with its disapproval, so that the "legislative" foundation of the basis of that rejection could be presented for court analysis.

Nor can we say, as the Supreme Court said with respect to some of the Commission's functions in *Buckley*, that the exercise of the veto power is virtually certain to occur. The fact that there were vetoes for a congressionally appointed commission is not conclusive (*see* note 1). Congress's post-*Buckley* awareness that this is an agency that must under the Constitution be executive-appointed may suggest to the legislature less accessibility of and scope for any veto. In any event we do not know the occasion, reasons or form of any congressional veto that may occur.

preme Court was able to rely on several earlier decisions discussing the appointment power, *e. g., Ex Parte Hennen*, 38 U.S. (13 Pet.) 230, 10 L.Ed. 138 (1839); *United States v. Germaine*, 99 U.S. 508, 25 L.Ed. 482 (1879); *Springer v. Philippine Islands*, 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1928), no such body of precedent is available to us with respect to the issues involved here.

3. The Supreme Court has recently noted the validity of the doctrine that interpretive regulations are respected for "guidance", but do not command the deference from the courts that attaches to substantive regulations that reflect administrative discretion. *General Electric Co. v. Gilbert*, 429 U.S. 125, 140, 97 S.Ct. 401, 410, 50 L.Ed.2d 343 (1976). The greater breadth of review for interpretive regulations was one of the factors cited for exempting them for the general notice-and-comment requirements of rulemaking. *See* Legislative History of the Administrative Procedure Act, S.Doc. 248, 79th Cong., 2d Sess., 18 (1946). Whatever the ultimate resolution of the difference of judicial approach on the test of when a ruling is to be considered "interpretive", *see* opinions in *Eastern Kentucky Welfare Rights Org. v. Simon*, 165 U.S.App.D.C. 1278, 506 F.2d 1278 (1974), rev'd on other grounds, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) ("legal effect" test as against "substantial impact" test), it is clear that some regulations are less conclusive on the courts because they are deemed "interpretive," i. e. partaking more of the quasi-judicial than of the quasi-legislative aspect of the agen-

cy's function. Similar considerations may lead the legislature itself to agree that such interpretive regulations are inappropriate for legislative interdiction or modification. There may still be room for legislative scrutiny of interpretive regulations—to propose amendatory legislation, or even to make comments to the agency (agencies often use notice-and-comment for interpretive regulations as being helpful, even though not required by the APA).

4. Pub.L. 94–283, the 1976 law that established a President-appointed Commission, amended 2 U.S.C. § 438(c) to add (5):

(5) For purposes of this subsection, the term "rule or regulation" means a provision or series of interrelated provisions stating a single rule of law.

The Conference Committee Report explains:

The conferees agree that this provision does not give the Congress the power to revise proposed regulations by disapproving a particular word, phrase, or sentence, but only gives each House of the Congress the power to determine which proposed regulations of the Commission constitute distinct regulations which can only be disapproved in whole. This provision is intended to permit disapproval of discrete self-contained sections or subdivisions of proposed regulations and is not intended to permit the rewriting of regulations by piecemeal changes.

H.Rep. 94–1057 (April 28, 1976) pp. 51–2, U.S. Code Cong. & Admin.News 1976, p. 967.

Plaintiffs argue that the possibility of a congressional veto is presently coercing the Commission to conform its proposals to congressional desires. But even in areas where there is no veto provision in a statute, there is congressional communication and influence—not least through the impact on appropriations, and often through investigations and correspondence as well as formal hearings. Concededly, the Commission staff consulted with congressional staff members and accepted some of their suggestions concerning regulations. But the staff solicited and accepted ideas from other sources. And it rejected other congressional suggestions. The fact that the Commission amended its proposed regulations to incorporate congressional suggestions may reflect not the yoke of a veto but a genuine reconsideration by the Commission in light of more complete information and analysis.[5]

## II. PRUDENTIAL CONSIDERATIONS

That this case is inappropriate for a major constitutional adjudication is clear from a cluster of prudential considerations, and in this context the term "prudential" includes jurisprudential, as distinguished from mere convenience in judicial administration.

First, there is a sound doctrinal basis for the exercise of discretion in a case where, as here, plaintiffs seek essentially declaratory relief.[6] In *Public Affairs Associates, Inc. v. Rickover*, 369 U.S. 111, 112, 82 S.Ct. 580, 582, 7 L.Ed.2d 604 (1962), the Court stated:

The Declaratory Judgment Act was an authorization, not a command. It gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so. [Citations omitted.] Of course a District Court cannot decline to entertain such an action as a matter of whim or personal declination. "A declaratory judgment, like other forms of equitable relief, should be granted only as a matter of judicial discretion, exercised in the public interest." *Eccles v. Peoples Bank*, 333 U.S. 426, 431, 68 S.Ct. 641, 644, 92 L.Ed. 784. We have cautioned against declaratory judgments on issues of public moment, even falling short of constitutionality, in speculative situations. *Eccles v. Peoples Bank*, supra, at 432, 68 S.Ct. [641] at 644.

*Accord, Public Service Comm'n v. Wycoff Co.*, 344 U.S. 237, 241, 73 S.Ct. 236, 239, 97 L.Ed. 291 (1952) (Declaratory Judgment Act is "an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant"). Decisions of this Circuit recognize the discretion available to the federal courts under the Declaratory Judgment Act. *Lampkin v. Connor*, 123 U.S.App.D.C. 371, 375, 360 F.2d 505, 509 (1966); *Marcello v. Kennedy*, 114 U.S.App. D.C. 147, 312 F.2d 874 (1962), *cert. denied*, 373 U.S. 933, 83 S.Ct. 1536, 10 L.Ed.2d 692 (1963).

In *Lampkin v. Connor, supra*, Judge McGowan pointed out: "The language of the Act is permissive: '[A]ny court of the United States * * * *may* declare the rights and other legal relations of any interested party seeking such declaration * * * (emphasis added).'" He concluded that "[I]t is appropriate, in the context of a declaratory judgment suit, to weigh a wider range of considerations than would be either necessary or appropriate if the only

---

**5.** We certainly do not have here any explicit congressional threats of a veto similar to those in *D. C. Federation of Civil Associations v. Volpe*, 148 U.S.App.D.C. 207, 459 F.2d 1231 (1971), *cert. denied*, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972).

**6.** Plaintiff-intervenor United States seeks only a declaration that the one-house veto provision of the Act is unconstitutional. Plaintiff Clark seeks similar declaratory relief and an injunction prohibiting the Commission from transmitting its proposed regulations to Congress and

commanding the Commission to prescribe them. To the extent that the latter request is viable at all, *see Sibbach v. Wilson & Co.*, 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941); Majority Opinion at page —— n.5, of 182 U.S.App. D.C., at page 646 of 559 F.2d n.5, this court would appear to have discretion before interfering by injunction with the operation of another branch of government. If the case is viewed solely as one in equity, it is difficult to make out the claim of threat of "irreparable injury" necessary for an injunction.

issue were one of standing." [7] 123 U.S.App. D.C. at 374, 360 F.2d at 509.

The discretion granted by the Declaratory Judgment Act has not been vacated by 2 U.S.C. § 437h. Senator Buckley proposed § 437h as a measure to provide for expeditious review of fundamental constitutional objections he had raised to the core of the law.[8] Section 437h achieves this objective by designating certain individuals and organizations as having an adequate interest to bring a constitutional challenge, by dropping the time required for district court determination, and by expediting review in this court and in the Supreme Court. What § 437h contemplates is that whatever the Court's ruling, it be announced earlier rather than later. What was sought was expedition of a judicial ruling, not a change in ruling. If the "appropriate" disposition of a case under the Declaratory Judgment Act is prudential dismissal, rather than a ruling on the merits, that is still the appropriate disposition, with an expedited announcement. This approach is congruent with the history of § 437h (see note 8), and with its text.

Section 437h recognizes that traditional forms of action would not be affected by the new law. Subsection (a) provides:

> The Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President of the United States *may institute such actions* in the appropriate district court of the United States, *including actions for declaratory judgment, as may be appropriate* to construe the constitutionality of any provision of this Act . . . (emphasis added).

The statute contains a positive direction as to standing, which is precedent to the permission that certain plaintiffs "may institute" actions, *cf. Gray v. Greyhound Lines,* 178 U.S.App.D.C. 91, 545 F.2d 169 (1976). But the statute leaves it to the court whether the actions instituted are "appropriate."

On such matters as adjudication and relief, Congressional directions to a court will not be taken as mandatory unless that conclusion is inescapable. See *Hecht v. Bowles,* 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944), where a provision that compliance orders "shall be granted" was denied a mandatory reading that would establish— "an absolute duty to do so under any and all circumstances. We cannot but think that if Congress had intended to make such a drastic departure from the traditions of equity practice, an unequivocal statement of its purpose would have been made." 321 U.S. at 329, 64 S.Ct. at 591.

Application of section 437h requires a conscientious effort to ascertain what Justice Frankfurter called the "mood" of the statute. The fair Congressional intention that I discern from this provision, adopted in 1974 on the briefest of presentation and virtually without discussion (see note 8), is a machinery for expedition but not a direction as to result. Thus, although the statutory provision reads like a direction to the appellate court to render a decision after a hearing on the questions as certified by the district court, the court has discretion to remand to the district court for a fact-finding proceeding. *Buckley v. Valeo,* 171 U.S.App.D.C. 168, 519 F.2d 817 (1975); *see* 424 U.S. 1 at 9, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (reciting the remand procedure). The court will respect Congress's intent for

---

7. *See Public Service Comm'n of Utah v. Wycoff Co., supra, Eccles v. Peoples Bank,* 333 U.S. 426, 68 S.Ct. 641, 92 L.Ed. 784 (1948).

8. 120 Cong.Rec. 10562 (April 10, 1974). Senator Buckley was concerned that the expenditure and contribution limits in the bill might impermissibly limit First Amendment freedoms, and for that reason sought expeditious review. At the time he introduced his provision for review, Senator Buckley stated:

> "[I]t is a modification that I am sure will prove acceptable to the managers of the bill. It merely provides for the expeditious review of the constitutional questions I have raised. I am sure that we will all agree that if, in fact, there is a serious question as to the constitutionality of this legislation, it is in the interest of everyone to have the question determined by the Supreme Court at the earliest possible time."

expedition,[9] but its course in proceeding toward disposition vel non calls for judicial discretion. The public interest in expedition is material, but § 437h does not terminate the court's discretion.[10]

In the exercise of discretion under the Declaratory Judgment Act, several factors are appropriately considered: the nature of the legal issues raised, whether there is a question of ripeness, the quality of the record presented, and the hardship that the plaintiff would suffer in the absence of an adjudication on the merits. *See National Student Association v. Hershey*, 134 U.S. App.D.C. 56, 68, 412 F.2d 1103, 1115 (1969).

As to the character of the record, the Supreme Court has cautioned against granting declaratory relief on issues of public moment in the absence of a fully concrete record, a "full-bodied record." *Public Affairs Associates, Inc. v. Rickover*, supra, 369 U.S. at 112–113, 82 S.Ct. 580 (1962); *Eccles v. Peoples Bank*, 333 U.S. 426, 434, 68 S.Ct. 641, 92 L.Ed. 784 (1948); *Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952).

The principle is illustrated in *Zemel v. Rusk*, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). After holding that a citizen seeking to travel to Cuba was entitled to a declaratory judgment whether a passport could lawfully be withheld (with the court ruling it could), the Court declined to entertain plaintiff's further prayer for a declaratory judgment on the issue of whether a criminal prosecution would be constitutionally permissible in the event he went to Cuba without a passport. Chief Justice Warren's opinion explained that the Declaratory Judgment Act provided a range of discretion, and in the sound exercise of its

discretion the Court declined the second action in the absence of a concrete factual situation. 381 U.S. at 18–20, 85 S.Ct. 1271.

For reasons explained in Part I, I do not believe we have the "full-bodied record" called for by the pertinent doctrine.

The need for a concrete record is especially significant in light of the nature of the issues raised here. If there is one point on which all parties agree, it is that this litigation seeks resolution of a constitutional question of grave import. Sound doctrine calls for judicial restraint in dealing with constitutional issues, *Rescue Army v. Municipal Court of Los Angeles*, 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947), and we should be particularly mindful of that policy when we are asked to delineate, as we are in this case, the respective powers and duties of the major branches of government. That kind of broad issue enhances the general temptation of a record lacking concrete detail, toward abstractness in analysis and broad pronouncements unsuited to the subtle workings of our constitutional system.

As to the hardship factor, the hardship that plaintiff will suffer in the absence of an adjudication on the merits is material in considering whether to entertain a controversy, *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); see *National Student Association v. Hershey*, 134 U.S.App.D.C. 56, 68, 412 F.2d 1103, 1115 (1969). A plaintiff faced with irreparable injury may have a claim in equity that has to be decided one way or the other. Lack of irreparable injury is no bar to declaratory judgment, but the corollary is that the court has more latitude to de-

---

**9.** Indeed the court does so even when there is no explicit direction to the court, and the contemplation of expedition must be inferred from the legislature's direction to the executive agency. *International Harvester v. Ruckelshaus*, 155 U.S.App.D.C. 411, 478 F.2d 615, 650 (1973). *See* H. Leventhal, *Appellate Procedures: Design, Patchwork, and Managed Flexibility*, 23 U.C.L.A.L.Rev. 432, 443–44 (1976).

**10.** The Supreme Court, in its discussion of ripeness in *Buckley*, referred to the congressional desire for an early resolution of the constitu-

tional questions involved there. 424 U.S. at 117, 96 S.Ct. 612. That certainly bears on the court's discretion, as an identification of certain prudential considerations of significance in the court's decision whether to hear the case. In that case there was a wide-ranging, fundamental challenge to the substantive provisions of the act, the kind of challenge that the sponsor envisioned as peculiarly compelling for prompt decision prior to the election year campaigns. (*See* note 8).

cline the controversy. *See Samuels v. Mackall*, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971). In this case, the hardship factor is minimal.

Plaintiff Ramsey Clark asserted an interest as a candidate for the Democratic nomination to be senator from New York. He alleged that one member of Congress opposed him in the primary election, and that if he were nominated, he would be likely to face Senator Buckley as nominee. In the event, he did not win the primary, nor did his Congressional contestant. Neither a judge nor Mr. Clark can assert whether it is likely that his interest as a candidate will recur. If he should decide to run again, and by that time the one-house veto provision has yielded concrete results, an action promptly begun and vigorously prosecuted can provide a timely decision.

Clark also asserts an interest as a voter, to vote in elections governed by the regulations of a fully independent Commission. Assuming this interest is sufficient to give him standing,[11] it is not the kind of personal hardship that would compel this court to decide this case at this time. Clark is not asserting that his personal First Amendment or other constitutional rights have been unfairly restricted. He alleges a structural defect in the rulemaking process, and an indirect and generalized harm. It does not impel a rush to judgment.

These considerations are not—repeat not—to be taken as restraint grounded in mootness. The doctrine of mootness is in flux, to say the least, but in any event

Clark's interest as a voter is clearly not moot. The point is that Clark's injury or threatened injury is not so substantial as to override prudential considerations for more perspective in disposition. *Compare Craig v. Boren.*[12]

Nor is injury made out by Clark's complaint of the delay in promulgating regulations. There is no doubt of the constitutionality of the provision, 2 U.S.C. § 438c, for a waiting period of 30 legislative days before regulations become effective. *Sibbach v. Wilson*, 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941). Although regulations issued by the Commission lapsed when Congress adjourned October 2, 1976, before the waiting period had expired, the Commission's Statement, dated Oct. 5, 1976, announced that although its proposed regulations had not technically become effective, they represented the "formally adopted views of the Commission" and should be taken as an "authoritative guide" as to the application of the election laws. Without determining the legal effect of these interpretative rules, or this adoptive announcement—a matter not before us—it reasonably appears that both candidates and voters have already received and will have in the future Commission guidance as to the meaning of the federal election law.

As to the claim of the "United States," it suffices to say that the expedited review of 437h was not made available to the United States. The Department of Justice asserts an interest in the separation of powers and

11. *See* Part III, *infra*.

12. 429 U.S. 190, 192, 97 S.Ct. 451, 454, 50 L.Ed.2d 397 (1976). *Craig* is cited even though it involves another prudential doctrine, that of standing to claim the rights of others, because it exemplifies how courts consider the importance of the rights asserted and the degree and immediacy of injury to the interests involved.

*Craig* also brings out the vitality of the recent turn in mootness doctrine that veers away from cases brought by individuals whose interest has expired. *Craig* was unanimous on only one point, the disappearance of the litigating posture of purchaser Craig when he became 21, citing *De Funis v. Odegaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1972). The "capable of repetition" doctrine seems to have been

reshaped to require either a projection of repetition for the particular party, *see Weinstein v. Bradford*, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975), or a class action, *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), which would be subject to all the procedural constraints on a class action, *see Board of School Comm'rs of the City of Indianapolis v. Jacobs*, 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975).

As for *De Funis*, whether or not that was the reason, the dismissal may be viewed as having given the Court the opportunity to defer a wide-ranging constitutional issue for a case and record that would provide fuller perspective and experience, enhancing sound disposition.

in the presidential veto power, but that cannot ride piggyback in this special proceeding if the action brought by a plaintiff specified by Congress is dismissed in the sound discretion of the court.

In prudential analysis the clear-cutness of the issue on the merits is pertinent. In the present case, we have an issue that merits reflection and development. That a judge as deliberate as Justice White believed such a provision to be constitutional,[13] and that other justices on the Supreme Court refrained from comment, bespeak need for care in decisionmaking on the issue.

## III. STANDING

Because I conclude that the court should decline to hear this case on prudential grounds, I do not reach the issues of standing raised here. I am satisfied that the majority opinion reserves the question as to whether a voter might have standing pursuant to statutory authorization to challenge the congressional veto provision. *See Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972).[14] Similarly, I am satisfied that the majority opinion does not decide whether or in what circumstances the President might bring an action challenging the veto provision.[15] These questions remain open for consideration in an appropriate case.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge, dissenting:

Were this an ordinary case amenable to orthodox principles of standing and ripeness, I might have been comfortable in sharing the position advocated by the majority of my colleagues. Perhaps with equal confidence I could also have joined in Judge Leventhal's separate opinion and its exposition of principles that normally might lead judges to a discretionary withholding of any declaration on the far-reaching issues tendered for decision. But this is not nearly the usual case; indeed, it is extraor-

---

**13.** *Buckley v. Valeo*, 424 U.S. 1, 283–86, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (White, J., concurring and dissenting).

I shall not discuss the merits of Justice White's observations, except to say I believe they have greater depth than Judge MacKinnon takes into account. In any realistic analysis, there is exercise of legislative power not merely by statute, but also by an executive-appointed official or board acting under a statutory delegation, and this is permissible under the Constitution, in view of realistic benefits to sound government, provided there are such safeguards as the requirement of standards, which enhance both fairness and Congressional oversight. *Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944); *Lichter v. United States*, 334 U.S. 742, 785–86, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948); *see generally Amalgamated Meat Cutters & Butcher Work. v. Connally*, 337 F.Supp. 737 (D.D.C.1971) (three judge court).

If the particular regulation by an executive official or executive-appointed agency reflects delegation of what is in substance legislative power, the question arises why the legislature may not provide instead that when exercising legislative rulemaking power, the agency is "an agent of the Congress" and the delegation of legislative power is conditioned on at least modest concurrence of the executive-appointed initiator and of the legislative branch. The American Constitution accommodates hybrids that work. *E. g.*, the Comptroller General is appointed by the President (with Senate consent, 31 U.S.C. § 42), but he conducts auditing for the Government "as an agent of the Congress," 31 U.S.C. § 65(d).

**14.** I do, however, discern a difference between a statute that confers standing on a citizen to bring suit to enforce a statute, as a kind of private attorney general, and a law that purports to confer standing to attack a statute, the kind of law that was held unavailing in *Muskrat v. United States*, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911). An action to enforce a statute may be upheld as a vindication of a statutory interest created by the legislature that arises to the dignity of an "entitlement." *Compare Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

**15.** In *Kennedy v. Sampson*, 167 U.S.App.D.C. 192, 511 F.2d 430 (1974), in which a panel of this court entertained an action by a Congressman challenging a "pocket veto", jurisdiction was apparently based on 28 U.S.C. §§ 1331, 1361. This was (under that plaintiff's allegations) an action to enforce, not attack, a statute, and it was an action to require the executive official to perform his duty under the statute. The majority opinion does not decide whether this form of action would be available to the executive seeking to challenge a statutory provision for a congressional veto.

dinary in the sense that it arises under a statute summoning the court's adjudicative powers to the constitutional maximum. Because the majority denies the case that measure of consideration, I must respectfully dissent.

Ramsey Clark, a registered voter then a candidate for the United States Senate, brought this constitutional challenge to the unicameral veto provisions of the Federal Election Campaign Act.[1] These provisions require every prospective action of any substance by the Federal Election Commission to lie before Congress for 30 legislative days, during which either House by majority vote may unilaterally forestall it.[2] Clark asserted that this procedure visited harm

1. 2 U.S.C. § 438(c) et seq. (Supp. V 1975), as amended by Act of May 11, 1976, Pub.L. No. 94–283, 90 Stat. 486, set out in note 1 of the majority opinion.

2. See 2 U.S.C. § 438(c)(5) (Supp. V 1975), as amended by Act of May 11, 1976, Pub.L. No. 94–283, 90 Stat. 486. Not only rules and regulations proposed by the Commission but also such advisory opinions as may state "a general rule of law" must be submitted to Congress for its approval. 2 U.S.C. § 437f (Supp. V 1975), as amended by Act of May 11, 1976, Pub.L. No. 94–283, 90 Stat. 482.

3. Clark's constitutional claims fall into two categories. Treating the rulemaking process first as an executive function, he argues (1) that giving Congress the final say on the Commission's regulations allows the legislature to exercise an executive function and violates the principle of separation of powers; (2) that incumbent legislators, as administrators, have built-in biases and thus cannot, consistently with due process, exercise power to promulgate regulations, cf. Ward v. Village of Monroeville, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972)—a claim also of a denial of equal protection insofar as electoral challengers are disabled from similarly affecting the Commission's actions; and (3) that the delegation from Congress qua legislators to Congress qua administrators is unconstitutional because it contains no meaningful standards. Styling rulemaking by the Commission in concert with Congress as legislative action, Clark then argues in the alternative, as it were, that the action infringes Art. I, § 7 of the Constitution because (1) it is not bicameral and (2) it deprives the President of the opportunity granted him by that article to veto any "Bill" before it becomes law. Most of these allegations are applicable to Clark both as a candidate and as a voter, while some—for instance, the Fifth

upon him *qua* candidate,[3] and caused him as well "to suffer unconstitutional impairment of his rights to vote, [and] to participate effectively in the political process. . . ."[4]

In the District Court proceedings leading to certification of constitutional questions to this court,[5] defendants raised a flurry of objections to our power, under statute[6] and Article III of the Constitution, to entertain this suit. Their briefs and oral arguments here, discussing questions of justiciability alone, at once declined to illuminate the issues on the merits and complained that too little light had been shed upon them. While I disagree with the majority's determination that this case is not presently cog-

Amendment "equal protection" claim—appear cognizable only in his candidate's guise. In view of the majority's disposition—and mine—these questions need not now be reached.

4. Complaint ¶ 23 at 8.

5. See Maj.Op. at note 2.

6. 2 U.S.C. § 437h (Supp. V 1975), as amended by Act of May 11, 1976, Pub.L. No. 94–283, 90 Stat. 496, set out in full in note 2 of the majority opinion, is the only source of our jurisdiction. As detailed in the majority opinion at note 4, cf. Tamm, J., concurring, the United States was granted intervention pursuant to Fed.R.Civ.P. 24(b)(2) over the strenuous objections of all defendants. Since the unique jurisdictional grant of § 437h omits the United States from the designation of its beneficiaries, the continuing vitality of Clark's action is a necessary predicate to the United States' presence as a litigant. In this respect Judge Leventhal and I agree. Yet even in that event we could tolerate intervention by the United States only as an exercise of some sort of ancillary jurisdiction. That would pose complex problems, not the least of which, as Judge Tamm notes, is the question whether the Attorney General has the requisite authority to appear. Because of the majority's dismissal of Clark's suit and of the novelty of the United States' undertaking, this is hardly the appropriate occasion for any expressions on the propriety of the United States' intervention. Mayhap either the United States or the President himself may bring this suit in District Court, cf. Leventhal J., concurring, at note 13. I intimate no view concerning such a course, which would necessitate deciding whether § 437h is the exclusive vehicle for constitutional challenges to the Act.

nizable because unripe, I do agree with defendants in their insistence that the merits deserve additional elucidation. Thus, unlike Judge MacKinnon, I do not think it mete to proceed immediately to the substance of Clark's claims. Instead, I would defer consideration of the merits until defendants have generated the light they have previously elected not to provide.

## I

Four days after oral argument in this court, Clark failed of the Democratic nomination for the senatorial seat he sought. That happenstance moots his case insofar as it depends on his status as a candidate.[7] But, as noted above,[8] Clark also alleges impairment of his rights as a voter and participant in the political process, and those injuries the majority deems not yet ripe for judicial redress. That judgment seems[9] to hinge solely on the fact that Congress has yet to exercise its prerogative to disapprove regulations of the Commission as reconstituted.[10] This is the upshot of a double misconception, first as to the import of Clark's allegations of injury,[11] and additionally as to the standard for determining "ripeness" under Article III.[12]

While Clark's injuries have not been given detailed exposition, one may glean from a fair reading of the complaint that his is a challenge not to the statute as applied to any particular situation but to the inevitable effects of its operation in any context. He notes that by July, 1976, the reconstituted Commission had agreed on certain regulations representing its "present thinking," but did not even propose them to Congress until it had allowed key legislative aides additional time to make substantial revisions.[13] Then, in early August, the regulations as approved by the Commission were submitted to Congress for its blessing,[14] but by the time Congress adjourned *sine die* on October 2 only 28 legislative days had elapsed. Consequently, as we know, our recent national elections had to be conducted without the benefit of regulations promulgated by the Commission. These facts are cited not as evidence of constitutional transgression but to illustrate the defects inhering in the statutory scheme. The presence of the congressional oversight provision, by pretermitting all prospective Commission action, has deprived Clark of

7. In this respect the majority and I are in accord. See Maj.Op. following note 30. It does not, at present, appear that Clark should be permitted to press his claims on the ground they are "capable of repetition, yet evade review." It does not seem to me unlikely that someone may remain a candidate long enough to secure judicial redress of such grievances. But see *Moore v. Oglivie*, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969).

8. See text *supra* at note 4.

9. The gist of the majority's explication of its holding concerning Clark is as follows:

> As a voter Clark protested no specific veto action taken by Congress and identified no proposed regulations tainted by the threat of veto on review. Nor does he suggest that facial provisions of the Act inhibit his political activities as a voter in any way. It may well be that the facial provisions of the Act, if and when implemented, might in some way inhibit his rights as a voter. On this record, however, we must dismiss his present claim as unripe.

Maj.Op. at —— of —— U.S.App.D.C., at 647 of 559 F.2d.

10. Congress had twice exercised the veto power on Commission regulations when the Supreme Court decided in *Buckley v. Valeo*, 424 U.S. 1, 135, 96 S.Ct. 612, 690, 46 L.Ed.2d 659, 754 (1976), that the statutorily prescribed mode of choosing Commission members violated Art. II, § 2, cl. 2 of the Constitution, and that a Commission so chosen could exercise no rule-making powers at all, no matter what means it adopted. See notes 43–54 *infra*. On May 11, 1976, Congress amended the Act to excise the obnoxious appointments mechanism. Act of May 11, 1976, Pub.L. No. 94–283, 90 Stat. 475–476. It retained intact the veto provision in controversy, and in fact extended its scope to encompass advisory opinions as well. See note 2 *supra*.

11. Discussed in this part of my opinion.

12. "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution [and] the Laws of the United States . . . ." U.S.Const., art. III, § 2. See Part II *infra*.

13. Stips. ¶¶ 63–76.

14. Stip. ¶ 79.

the value he would have derived from regulations formulated by a truly independent Commission. As a second and distinct type of injury, Clark alleges that "[b]ecause of the necessity of avoiding a vote of disapproval by a body of Congress, the COMMISSION has and will continue to modify proposed rules and regulations to correspond with what its members perceived to be the desires and wishes of Congress . . . ,"[15] thereby creating an imbalance otherwise avoidable in the regulations submitted to Congress.[16]

The majority's approach, keyed as it is to actual recourse to the veto provision by Congress, neglects the inevitable two-edged effect attributed to it by Clark. It can hardly be gainsaid that delays of the sort heretofore encountered, no less than actual vetoes, deprive voters *pro tanto* of the protections of the Act. And it could be, as Clark asserts, that any regulations emerging from Congress will be "tainted" by the influence that body has on the Commission's decision-making processes. One or the other claimed injury is visited on voters whether Congress approves, disapproves, or owing to circumstances takes no action at all.

That is the nature of the harm that Clark charges. To repeat, it is not dependent upon exercise of the congressional veto. On the contrary, it allegedly is inflicted irrespective of the veto. In sum, by Clark's estimate, it is suffered as much now as it will be later. In addressing the question whether this case is ripe for judicial consideration, we should take the litigant's claim

as he advances it. That, I fear, my colleagues in the majority have failed to do, and resultantly have decided a case that is not before us.

## II

This analysis of Clark's claims leads naturally to an examination of the standard by which the propriety of judicial consideration must be measured. The starting point, of course, is the provision governing judicial resolution of constitutional challenges to the Act, 2 U.S.C. § 437h.[17] The section is explicit: designated parties may institute district court actions appropriate for the purpose, whereupon the constitutional questions must be certified to the court of appeals for the circuit, which "shall hear the matter sitting en banc."[18] A prominent feature of Section 437h is the specification of expedited procedures,[19] effectuating the congressional view that "if, in fact, there is a serious question as to the constitutionality of this legislation, it is in the interest of everyone to have the question determined by the Supreme Court at the earliest possible time."[20]

The first occasion to construe Section 437h arose in *Buckley v. Valeo*.[21] When that case was here, we acknowledged that Congress envisioned full compliance with the requirements of Article III,[22] and noted that actions under Section 437h

> are not to be decided unless the inhibitory effects of the challenged provisions are "definite and concrete," "touching the legal relations of parties having adverse legal interests," and "admitting of specif-

---

15. Complaint ¶ 19 at 7.

16. It is noteworthy in this regard that the Commission has expressed its intention "to administer the Act in a fashion which implements the interpretations set forth in the proposed regulations," Statement of the Federal Elections Commission, October 5, 1976, so that any "taint" inhering in the regulations inheres also in the Commission's present thinking by which it will perform its other statutory functions.

17. See Maj.Op. at note 2.

18. See Maj.Op. at note 2.

19. See Maj.Op. at note 2.

20. 120 Cong.Rec. 10562 (1974) (remarks of Senator Buckley, sponsor of the amendment adding § 437h). See note 30 *infra* and accompanying text.

21. 171 U.S.App.D.C. 172, 519 F.2d 821 (1975) *aff'd in part and rev'd in part*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

22. *Id.* at 201–202, 519 F.2d at 850–851.

ic relief through a decree of 'a conclusive character." [23]

Nonetheless, we felt that more was necessary to decision of the question whether, in light of the methodology by which members of the Commission were then appointed,[24] it could constitutionally exercise the powers that Congress had conferred upon it. We concluded that while the efficacy of two powers of the Commission was ripe for decision, the validity of others was not because "[i]n its present stance, this litigation does not present the court with the concrete facts that are necessary to an informed decision." [25] We thus refrained as well from any decision on the constitutional questions with which we are presented today.[26]

On review of our decision in *Buckley*, the Supreme Court likewise found no blinking the constitutional need for a case or controversy,[27] but the Court discovered—in the contentions grounded on the Appointments Clause—a broader controversy than we had perceived.[28] Central to its finding on that score was the "distinction between jurisdictional limitations imposed by Art. III and '[p]roblems of prematurity and abstractness' " that invoke the conventional judicial doctrine of ripeness.[29] The Court pointed out that by adoption of Section 437h Con-

gress had manifested that it "was . . . most concerned with obtaining a final adjudication of as many issues as possible litigated pursuant to [its] provisions . . ." [30] The congressional directives incorporated into Section 437h were seen as imposing constraints on judicial recourse to the ripeness doctrine so long as there was a case or controversy within the meaning of Article III.[31]

To some extent, then, the Supreme Court's decision in *Buckley* was consistent with our own views. Where the Court parted company was in the test it applied to determine whether the temporal dimension of Article III was present. "Where the inevitability of the operation of a statute against certain individuals is patent," the Court said, "it is irrelevant to the existence of the justiciable controversy that there will be a time delay before the disputed provisions will come into effect." [32] And since "ripeness is peculiarly a question of timing," [33] the Court held that where parties "raise constitutional questions of separation of powers with respect to an agency designated to adjudicate their rights," the fact that the "claim is of impending future rulings and determinations by the Commission . . . [poses] a question of ripeness, rather than lack of case or controversy un-

**23.** *Id.* at 202, 519 F.2d at 851, quoting *Aetna Life Ins Co. v. Haworth*, 300 U.S. 227, 240–241, 57 S.Ct. 461, 464, 81 L.Ed. 617, 621–622 (1937).

**24.** See note 10 *supra*.

**25.** 171 U.S.App.D.C. at 244, 519 F.2d at 893.

**26.** *Id.* at 247, 519 F.2d at 896.

**27.** *Buckley v. Valeo, supra* note 10, 424 U.S. at 114, 117, 96 S.Ct. at 680–681, 46 L.Ed.2d at 742, 744.

**28.** *Id.* at 117–118, 96 S.Ct. at 681–682, 46 L.Ed.2d 744.

**29.** *Id.* at 114, 96 S.Ct. at 680, 46 L.Ed.2d at 742, quoting *Socialist Labor Party v. Gilligan*, 406 U.S. 583, 588, 92 S.Ct. 1716, 1719, 32 L.Ed.2d 317, 322 (1972).

**30.** *Buckley v. Valeo, supra* note 10, 424 U.S. at 117, 96 S.Ct. at 681, 46 L.Ed.2d at 743. We ourselves had noted that "Congress was con-

cerned with the inhibitory effect of a massive rearrangement of regulations operating upon federal campaigns and elections, and wanted election participants to be permitted expeditiously to test the facial validity of limitations and requirements imposed by the challenged Acts." *Buckley v. Valeo, supra* note 21, 171 U.S.App.D.C. at 201–202, 519 F.2d at 850–851 (footnote omitted).

**31.** *Buckley v. Valeo, supra* note 10, 424 U.S. at 117, 96 S.Ct. at 681, 46 L.Ed.2d at 744.

**32.** *Id.* at 114, 96 S.Ct. at 680, 46 L.Ed.2d at 742, quoting *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 143, 95 S.Ct. 335, 358, 42 L.Ed.2d 320, 353 (1974).

**33.** *Buckley v. Valeo, supra* note 10, 424 U.S. at 114, 96 S.Ct. at 680, 46 L.Ed.2d at 742, quoting *Regional Rail Reorganization Act Cases, supra* note 32, 419 U.S. at 140, 95 S.Ct. at 357, 42 L.Ed.2d at 351.

der Art. III," and as such is judicially cognizable.[34]

Thus the important inquiry in terms of Section 437h is not whether the impact of the challenged statutory provisions is imminent or has already occurred but whether sooner or later it necessarily will, as the Court's *Buckley* treatment so vividly demonstrates. By the time the Court reached its decision, the Commission had exerted another of its theretofore unused powers but "many of its other functions remain[ed] as yet unexercised."[35] Their "all but certain exercise", however, was held to warrant consideration, on the constitutionality of the appointive scheme, of "all of those aspects of the Commission's authority which have been presented by the certified questions."[36]

This exploration into the purpose and potency of Section 437h, as I believe the Supreme Court ascertained them in *Buckley*, guides me to a dispositional premise I find inescapable. Section 437h is both an endowment of exceptional judicial power and a command to use it in litigation attacking the constitutionality of any provision of the Act. The grant is coextensive with the constitutional maximum of adjudicative authority, observing no limit save the existence of a case or controversy. The mandate to the judiciary is equally apparent: constitutional questions emerging are to be decided if only their determination is possible in the constitutional sense. Prudential considerations, so viable in ordinary cases, have no role in disputes cognizable under Section 437h. That is because Congress deemed those disputes extraordinary in terms of need for prompt resolution, and deserving of extraordinary treatment by the courts.

With all due respect, I submit that my colleagues in the majority, while acknowledging that the proper test is that required by Article III,[37] have not applied the Article III standard enunciated by the Supreme Court in *Buckley*. Here, as there, we have an "agency"—this time the combination of the Commission and Congress—with a statutory duty[38] to adopt rules and regulations implementing the Act.[39] If and when that duty is discharged—and, as noted earlier, even for as long as it is not[40]—the consequences of an allegedly impermissible commingling of legislative and executive functions will operate on Clark in the manner charged.[41] To be sure, the time at which regulations may be forthcoming is uncertain, but I cannot believe that it will never arrive. And even if perchance that day never comes, the inevitability of the harm Clark complains of is not affected in the least. By its very nature, his injury arose on passage of the Act and will subsist as long as congressional approval of Commission rulemaking remains a legislative feature.[42] The future will not alter Clark's dilemma as a voter; for him the future is now.

The majority opinion notes that the question before us today was not resolved by the Supreme Court in *Buckley*,[43] although the constitutionality of the unicameral veto was a certified question.[44] From this it is sought to be inferred that the Court found

34. *Buckley v. Valeo, supra* note 10, 424 U.S. at 117, 96 S.Ct. at 681, 46 L.Ed.2d at 743–744.

35. *Id.* at 116–117, 96 S.Ct. at 681, 46 L.Ed.2d at 744.

36. *Id.*

37. See Maj.Op., 182 U.S.App.D.C. at ——, 559 F.2d at 646–647.

38. See 2 U.S.C. § 438(a)(10) (Supp. V 1975).

39. It may be argued that since the Commission will not "adjudicate" as to voters, the *Buckley* test is somehow misplaced. This, however, is a question of standing, not ripeness, and Clark seems also to have standing to prosecute this action. See Part IV *infra*.

40. See text *supra* following note 16.

41. See note 3 *supra*.

42. See Part I *supra*.

43. Maj.Op., 182 U.S.App.D.C. at ——, 559 F.2d at 651–652.

44. *Buckley v. Valeo, supra* note 10, 424 U.S. at 137 n.175, 140 n.176, 96 S.Ct. at 690 n.175, 692 n.176, 46 L.Ed.2d at 755 n.175, 757 n.176.

the question unripe.[45] I cannot accept this inference, for it is plain to me that the Court declined to decide the veto question because its disposition eliminated, for the time being at least, the possibility of any such veto.[46] As the Court carefully explained, "[b]ecause of our holding that the manner of appointment of the members of the Commission precludes them from exercising the rulemaking powers in question, we have no occasion to address"[47] the veto issue. Since the Court held that the Commission as originally constituted could not, consistently with the Constitution, promulgate regulations, there was nothing upon which Congress might then exercise the veto. And the Court's consideration of that issue was truncated not only by the evanescence of the Commission's power, but by its realization· that in response to its decision Congress "might choose not to confer" rulemaking powers on a hypothetical successor Commission.[48] Therefore the Court merely adhered to ancient but wholesome policy in avoiding constitutional questions unnecessary to its decision. Seen in this light, I cannot endorse the majority's theory that the Court either deferred review of the veto questions on prudential grounds or implicitly decided that the *Buckley* plaintiffs lacked an Article III case or controversy as to that question.[49]

Nor, unlike the majority, can I attach significance to the wording of the Supreme Court's time-limited stay of its mandate in

*Buckley* "insofar as it affects the authority of the [improperly constituted] Commission to exercise the duties and powers granted it under the Act."[50] The argument is that the mere existence of the stay[51] indicates that the Supreme Court felt that the challenge to the unicameral veto provisions was unripe at the time of that decision since, according to the majority, it allowed the Commission to continue to utilize powers it had no constitutional ability to exercise.[52] That this is an erroneous reading of the stay is sufficiently demonstrated by the next sentence in the Court's *Buckley* opinion, which explains that the purpose of the stay was to "afford Congress an opportunity to reconstitute the Commission . . . without interrupting enforcement of *the provisions the Court sustains* . . ."[53] In relation to the Appointments Clause question, the rulemaking powers of the Commission were invalidated, not sustained; and only a peculiar reading of the stay could have given the Commission a period within which it might unconstitutionally promulgate all the regulations it could manage to process. This reading, moreover, is fundamentally at odds with everything the Court had to say on the subject of ripeness in Section 437h cases.[54] The more reasonable interpretation is that during the stay period the Commission, although *de jure* unconstitutional, could continue to exert such powers as it would be

---

**45.** Maj.Op., 182 U.S.App.D.C. at ——, 559 F.2d at 652.

**46.** The majority disputes this seemingly indisputable proposition, relying entirely on the less than pellucid language of the Supreme Court's stay of its mandate in *Buckley,* 424 U.S. at 143, 96 S.Ct. at 693, 46 L.Ed.2d at 758. As hereinafter noted, see text *infra* at notes 50–54, this reliance is misplaced.

**47.** *Buckley v. Valeo, supra* note 10, 424 U.S. at 140 n.176, 96 S.Ct. at 692 n.176, 46 L.Ed.2d at 757 n.176.

**48.** *Id.* at 137 n.175, 96 S.Ct. at 690 n.175, 46 L.Ed.2d at 755 n.175.

**49.** Maj.Op., 182 U.S.App.D.C. at ——, 559 F.2d at 652.

**50.** 424 U.S. at 143, 96 S.Ct. at 693, 46 L.Ed.2d at 758, quoted in Maj.Op., 182 U.S.App.D.C. at ——, 559 F.2d at 653.

**51.** The stay was predicated on voting rights cases wherein elections conducted in accordance with a district court plan are accorded *de facto* validity even though the plan is overturned on appeal. See, *e.g., Georgia v. United States,* 411 U.S. 526, 541, 93 S.Ct. 1702, 1711, 36 L.Ed.2d 472, 485 (1973); *Connor v. Williams,* 404 U.S. 549, 550–551, 92 S.Ct. 656, 658, 30 L.Ed.2d 704, 706 (1972).

**52.** Maj.Op., 182 U.S.App.D.C. at ——, 559 F.2d at 653.

**53.** 424 U.S. at 143, 96 S.Ct. at 693, 46 L.Ed.2d at 758 (emphasis added).

**54.** See text *supra* at notes 29–34.

constitutional for it to exercise, while Congress decided whether it wanted to resurrect the Commission at all.

## III

The majority's treatment of the timeliness question, barren as it is of precedential authority, neglects also the significant body of case law supporting cognizance of litigation similar to Clark's. Perhaps the closest example is that of the *Regional Rail Reorganization Act Cases*,[55] upon which the Supreme Court's justiciability decision in *Buckley* chiefly relied.[56] A question there was whether unconstitutional deficiencies in compensation for a statutory taking of rail properties might, if necessary, be redressed by a suit under the Tucker Act.[57] No plan for conveyance of the properties had been finally formulated, nor had any plan been proposed for judicial approval, a prerequisite to adoption.[58] Whether an unconstitutional taking would or would not result was unknowable, because it was dependent on a huge number of variables; only one thing was certain: that plans were to be submitted until ultimately one was approved.[59] The ineluctable operation of that statutory scheme was deemed sufficient to imbue the remedies question with sufficient timeliness to satisfy Article III.[60]

Other cases support a similar test for determining whether at the time of adjudication there is an Article III "case or controversy." In *Times Film Corporation v. Chicago*,[61] for instance, at issue was the ripeness of a challenge to a city ordinance establishing a licensing procedure for motion picture exhibitions, and requiring distributors to submit films for "approval" before they could be licensed. One distributor's challenge, not to a censor's decision, but to the prescribed procedure—to the "censor's basic authority"[62]—was held ripe

55. *Supra* note 32.

56. See *Buckley v. Valeo, supra* note 10, 424 U.S. at 114–117, 96 S.Ct. at 680–682, 46 L.Ed.2d at 742–744.

57. *Regional Rail Reorganization Act Cases, supra* note 32, 419 U.S. at 147, 95 S.Ct. at 360–361, 42 L.Ed.2d at 356.

58. *Id.* at 140, 95 S.Ct. at 357, 42 L.Ed.2d at 351–352.

59. *Id.* at 140–142, 95 S.Ct. at 357–358, 42 L.Ed.2d at 351–353.

60. *Id.* at 143, 95 S.Ct. at 358, 42 L.Ed.2d at 353. Compare text *supra* at notes 32–34. The "inexorability" component of Article III ripeness may also be seen as decisive in cases challenging the operation of criminal statutes before actual invocation against the plaintiffs. Compare, *e.g., Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 1215–1216, 39 L.Ed.2d 505, 514–515 (1974), with *Younger v. Harris,* 401 U.S. 37, 41, 91 S.Ct. 746, 749, 27 L.Ed.2d 669, 674 (1971). See also *California Bankers Ass'n v. Shultz,* 416 U.S. 21, 56, 73, 94 S.Ct. 1494, 1513, 1523, 39 L.Ed.2d 812, 837–838, 847 (1974); K. Davis, Administrative Law of the Seventies §§ 21.05–21.06 (1976). Another series of cases with logical underpinnings supporting the "inevitability" standard epitomized by *Buckley* and the *Rail Reorganization Act Cases* is that establishing the "capable of repetition yet evading review" exception to the mootness doctrine. See, *e.g., Super Tire Eng'r Co. v. McCorkle,* 416 U.S. 115, 121–127, 94 S.Ct. 1694, 1698–1700, 40 L.Ed.2d 1, 7–10 (1947), where, although circumstances meriting injunctive relief had ceased to exist, a declaratory judgment action was held to satisfy both Article III and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202 (1970), because the challenged governmental action "does not rest on . . . distant contingencies" but on a "fixed and definite" governmental policy that, "by its continuous and brooding presence, cast[s] what may well be a substantial adverse effect on the interests of the petitioning parties." *Id.* at 121–122, 94 S.Ct. at 1698, 40 L.Ed.2d at 8.

61. 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961).

62. *Id.* at 47, 81 S.Ct. at 393, 5 L.Ed.2d at 406. The same sort of challenge was entertained in *Public Utils. Comm'n of California v. United States,* 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958). There California's scheme of common carrier regulation gave the state commission jurisdiction to set rates for intrastate shipments by the United States. The federal government brought an action challenging any such assertion of jurisdiction without first undertaking negotiation with haulers or initiating any action before the state commission. The state defended on justiciability grounds, but since it had "plainly indicated an intent" to exercise the challenged jurisdiction, 355 U.S. at 538, 78 S.Ct. at 450, 2 L.Ed.2d at 474, and the only question was the purely legal one whether such jurisdiction could be exercised, the case

for resolution before he had submitted to the ordinance in any way, because so long as he desired to exhibit his films within the city it would inexorably operate on him.[63]

Such a test of justiciability is wholly consistent with the concerns inherent in the ripeness doctrine as enunciated by the Supreme Court and by us. The "basic rationale" of that doctrine is

to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way. . . .[64]

There is, in the instant case, no unavoidable danger of the courts "entangling themselves in abstract disagreements";[65] there is to be decided only a "purely legal issue."[66] And I, for one, cannot imagine any facts

which would place "judicial appraisal" in this case "on a much surer footing."[67] It may be that we would have more factual "stuff" for decision[68] if and when Congress either votes to disapprove Commission-proposed regulations or allows them to become law, but deferring judicial resolution of Clark's claim to that point would raise as many problems as it would solve. If Congress lets the regulations go into effect, it will not have exercised the power of which Clark complains, and the result will be much the same as that obtaining in the absence of the lie-over provision. The "taint" of this Damoclean congressional purview will inhere in the regulations, however, and that taint will form the nub of any injury suffered by the voter at large. If such a taint would render Clark's case justiciable then, and if—as no one can doubt—the facts establishing that taint are all present at this moment,[69] why is the case unripe now?[70] If, on the other hand, Con-

was held to satisfy Art. III and declaratory judgment was held available. *Cf. Railroad Transfer Serv. v. Chicago,* 386 U.S. 351, 358, 87 S.Ct. 1095, 1099, 18 L.Ed.2d 143, 148 (1967), where the Court noted that where the challenge was to the constitutionality of a statute, and its operation on the plaintiff was inescapable, it was not obligated to wait until the administrative procedures had run their full course before bringing suit. See also cases cited *supra* note 60.

**63.** 365 U.S. at 45, 81 S.Ct. at 392, 5 L.Ed.2d at 405.

**64.** *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681, 691 (1967). *Cf. Independent Bankers Ass'n v. Smith,* 175 U.S.App.D.C. 184, 190–192, 534 F.2d 921, 927–929 (1976); *National Automatic Laundry & Cleaning Council v. Shultz,* 143 U.S.App.D.C. 274, 280, 443 F.2d 689, 695 (1971), both stating the rule in terms of "fitness for judicial resolution" and "hardship" resulting from delay in such a resolution.

**65.** *Abbott Laboratories v. Gardner, supra* note 64, 387 U.S. at 148, 87 S.Ct. at 1515, 18 L.Ed.2d at 691. *Cf. Duke City Lumber Co. v. Butz,* 176 U.S.App.D.C. 218, 219, 539 F.2d 220, 221 (1976) (parties must show that injury alleged "is more than an abstract possibility at this time"). See also *Flemming v. Florida Citrus Exchange,* 358 U.S. 153, 167–168, 79 S.Ct. 160, 168–169, 3 L.Ed.2d 188, 196–197 (1958).

**66.** *Independent Bankers Ass'n v. Smith, supra* note 64, 175 U.S.App.D.C. at 190, 534 F.2d at

927. Sée *Abbott Laboratories v. Gardner, supra* note 64, 387 U.S. at 150, 87 S.Ct. at 1515, 18 L.Ed.2d at 691; *Wilderness Soc'y v. Morton,* 156 U.S.App.D.C. 121, 127 n.1, 479 F.2d 842, 848 n.1, *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973); *Citizens Communications Center v. FCC,* 145 U.S.App.D.C. 32, 36, 447 F.2d 1201, 1205 (1971); *National Automatic Laundry & Cleaning Council v. Shultz, supra* note 64, 143 U.S.App.D.C. at 280, 443 F.2d at 695. It is of note that here, as in *Independent Bankers, supra* note 64, a stipulation of facts eliminates any dispute as to the specifics of the underlying controversy, thus sharpening the legal issue. See 175 U.S.App. D.C. at 190, 534 F.2d at 927.

**67.** *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 164, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697, 702 (1967). *Cf. Davis v. Ichord,* 142 U.S.App.D.C. 183, 196, 442 F.2d 1207, 1220 (1970) (Leventhal, J. concurring).

**68.** Frankfurter, *A Note on Advisory Opinions,* 37 Harv.L.Rev. 1002, 1003 (1924).

**69.** See Stips. ¶¶ 63–76; Partial Transcript, July 8, 1976, Meeting of Federal Election Commission 1–3, 6.

**70.** Even though the regulations that expired when Congress adjourned are not binding on the Commission, the latter has announced its intention to administer the Act in accordance with them, thus giving them substantial effect.

gress should vote to disapprove, no tainted regulations will pass into effect, but such injury as devolves upon the voter by recourse to the veto will obtain, just as it does now, for from the date of its establishment to the date Congress reconvenes the Commission will have been prevented by *Congress* from promulgating binding regulations.

Thus the impact on voters like Clark, such as it is, emanating from the claimed constitutional defects in the statute is inevitable. That impact will not become any more or less susceptible to judicial disposition by congressional allowance or non-allowance of any particular regulation. If Clark's allegations are correct—a matter upon which I intimate no view—Congress will continue to look at proposed regula-

tions with an eye to favoring its own incumbency, and the Commission will continue to yield to congressional pressure in proposing action for approval. So, "because of the structure of the Act there is no better time to decide" [71] Clark's case. That there may be others whose contentions may later be more easily adjudicated is beside the point.

Beyond these considerations, we would not, by entertaining this action, interpose ourselves in any agency decision-making process. Ours is not a question as to whether agency proposals would, if they became the predicate for agency action, transgress legal limits on such action. We have before us nothing which by administrative interpretation might elide the constitutional controversies presented,[72] and no

See note 16 *supra.* This court has often found such "interpretative rulings" to have the requisite concreteness to justify judicial purview, provided that a purely legal issue is presented for judicial resolution, and the balance of hardship on the parties tips in favor of immediate review. See, *e.g., Independent Bankers Ass'n v. Smith, supra* note 64, 175 U.S.App.D.C. at 190–192, 534 F.2d at 927–929; *Citizens Communications Center v. FCC, supra* note 66, 145 U.S.App.D.C. at 36, 447 F.2d at 1205. Indeed, in *National Automatic Laundry & Cleaning Council v. Shultz, supra* note 64, we permitted review of an administrator's interpretation of a statutory standard couched in a letter to affected parties, because it presented a purely legal question and the costs of delay might have been great. *Cf. National Student Ass'n v. Hershey,* 134 U.S.App.D.C. 56, 412 F.2d 1103 (1969); K. Davis, Administrative Law of the Seventies, § 21.08 (1976) (approving the *Automatic Laundry* holding, which is "almost surely the present law"). See also Comment, *A Functional Approach to the Applicability of Section 553 of the Administrative Procedure Act to Agency Statements of Policy,* 43 U.Chi.L.Rev. 430, 444–451 (1976). Thus the majority is in the anomalous position of denying review to procedures resulting in formal action whereas, if someone had challenged the informal adoption of the regulations, he might have secured review.

**71.** *Regional Rail Reorganization Act Cases, supra* note 32, 419 U.S. at 144, 95 S.Ct. at 359, 42 L.Ed.2d at 354.

**72.** One of Clark's objections to the operation of the veto *schema* is that it represents an unconstitutional delegation without proper standards from Congress to Congress. See note 3 *supra.*

Congress *qua* agency might conceivably formulate standards to guide the exercise of its statutory prerogative; if we assume the proper standard for deciding the legality of such a "delegation" to be the present standard for judging more commonplace delegations, see *Amalgamated Meat Cutters v. Connally,* 337 F.Supp. 737, 758 (D.D.C.1971); K. Davis, Administrative Law of the Seventies, § 2.00 (1976), then we might find ourselves disposed to await the possibility of such self-imposed curbs on Congress' authority. Putting aside for the moment the possibility that such an internal structuring of congressional power would be unreviewable, *cf. Coleman v. Miller,* 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), in which event a different situation might obtain, see H. Leventhal, *Principled Fairness and Regulatory Urgency,* 25 Case W.Res.L.Rev. 66, 70 (1974), we need not and should not defer cognizance of this litigation on that basis for two reasons. First, Clark presents a host of challenges to the Act that in no way depend upon a lack of standards, and thus there is no reason to defer *those* claims. Only if they do not suffice to invalidate the veto provision would we have need to pass on the "delegation" claim. Second, even if we got that far, we would encounter a discrete question: is *any* delegation of this sort valid, no matter what standards are employed? *Cf. National Cable Ass'n v. United States,* 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974). Only if we could conceive of some valid delegation need we worry about the possibility that it can be saved by administrative self-restraint. Thus our situation is analogous to that faced in *Times Film Corp. v. Chicago, supra* note 63. There the Supreme Court found ripe for adjudication the broad claim that any prior restraint on speech was

policy decisions remain to be formalized. In sum, the questions stand in stark relief.

Lastly, to the extent that the timing of our decision affects the activity of the parties, an early decision would be salutary as to each. At present, neither Congress nor the Commission stands in jeopardy of any disruption by our cognizance of Clark's case. Indeed, the sooner we decide the constitutional questions he tenders the sooner all can know whether the Act must be recast to withstand scrutiny. The hardship to Clark may pale in significance to that found in other ripeness cases involving millions of dollars or the prospect of criminal sanctions,[73] but that does not make it vanish.[74]

## IV

The majority opinion purports not to address the question of Clark's standing to maintain this action.[75] The fact is, however, that its discussion of ripeness is largely cast in language traditionally employed to test standing.[76] So deeply is standing thus implicated that I feel compelled briefly to indicate my views on that score.

Clark's standing now rests on his status as a voter. Section 437h, our jurisdictional grant, expressly purports to confer voter-standing to litigate constitutional attacks on provisions of the Act. As, on standing, the Supreme Court said in *Buckley*, "Congress, in enacting 2 U.S.C. § 437h, intended to provide judicial review to the extent permitted by Art. III."[77]

All agree that Article III requires that the plaintiff have a "personal stake"[78] in the determination of the questions he brings into court. It is clear also that the Supreme Court has recently applied prudential considerations[79] which have substantially limited the scope of some prior decisions[80] that might be viewed as more generously allowing access to the courts.[81] More relevantly, the holding in *United States v. Richardson*,[82] denying standing to a taxpayer who alleged constitutional transgressions, has cut back on expectations

invalid; it decided that some such restraints might be constitutionally supportable. Since more specific challenges to the regulatory apparatus in question were deemed unripe, it then left them for another day. 365 U.S. at 50, 81 S.Ct. at 395, 5 L.Ed.2d at 408. See also *Federation of Labor v. McAdory,* 325 U.S. 450, 459–460, 65 S.Ct. 1384, 1388–1389, 89 L.Ed. 1725, 1733–1734 (1945); *Electric Bond & Share Co. v. SEC,* 303 U.S. 419, 438–439, 58 S.Ct. 678, 685, 82 L.Ed. 936, 946 (1938). I see no reason why the numerous claims raised by Clark must *all* be deferred because one of them *might* not be ripe.

73. Cf. *Abbott Laboratories v. Gardner, supra* note 64; *Independent Bankers Ass'n v. Smith, supra* note 64; *National Automatic Laundry & Cleaning Council v. Shultz, supra* note 64.

74. Cf., e.g., *Medical Comm. for Human Rights v. SEC,* 139 U.S.App.D.C. 226, 234, 432 F.2d 659, 667 (1970), *vacated as moot,* 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972). See also *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).

75. Maj.Op., 182 U.S.App.D.C. at ——, 559 F.2d at 647. Cf. Leventhal, J., concurring 182 U.S. App.D.C. ——, 559 F.2d —— 662–663.

76. E. g., Maj.Op., 182 U.S.App.D.C. at ——, 559 F.2d at 647. "we are hard pressed to find any ripe injury or present 'personal stake' . . ."

77. 424 U.S. at 11–12, 96 S.Ct. at 631, 46 L.Ed.2d at 683.

78. *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 209, 93 S.Ct. 364, 367, 34 L.Ed.2d 415, 419 (1972); *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947, 961 (1968); *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 678 (1962). Cf. K. Davis Administrative Law of the Seventies, § 22.01 at 487–488, § 22.21 at 524 (1976).

79. See, e. g., *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974).

80. *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Flast v. Cohen, supra* note 78.

81. See K. Davis, Administrative Law of the Seventies, §§ 22.02–3 to 22.02–10 (1976).

82. *Supra* note 79. See also *Schlesinger v. Reservists Comm. to End the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974).

from *Flast v. Cohen* [83] that the "public action" [84] might move from concept to reality. Yet *Richardson*, by refusing to overrule *Flast*,[85] merely expressed what was implicit in *Flast*: [86] taxpayers may have a sufficient "personal stake" or "injury in fact" to raise a case or controversy within the ken of Article III,[87] but taxpayer-standing must prudentially be restricted to avoid inundating the courts with ideological challenges to every conceivable governmental action.

If taxpayer suits like Flast's involve sufficient injury to generate an Article III case, it is difficult to see how Clark's does less. The challenged expenditure of federal funds in *Flast* could in no way be said to affect Flast's tax bill, or in any other manner to injure her than to outrage her sensibilities and deprive her of an "aesthetic interest in good government." [88] At the very least, Clark may lay claim to that much.

The one recent case to test congressional power to impart standing, *Trafficante v. Metropolitan Life Insurance Company*,[89] also buttresses Clark's standing. There two tenants in an apartment complex challenged activities of the owner that allegedly discriminated against third parties. They were deemed to have been given standing by a statute providing a judicial forum to "[a]ny person who claims to have been injured by a discriminatory housing practice." [90] A finding that "the alleged injury to existing tenants by exclusion of minority persons from the apartment complex is the loss of important benefits from inter-racial associations" [91] satisfied Article III's demand for a personal stake. Perhaps more importantly, the entire Court agreed that Congress may, within the boundaries of Article III, extend standing so as to foreclose the court from recourse to any self-imposed constraints on their power to decide.[92]

As *Buckley* held, Congress has mandated judicial cognizance of any constitutional challenge to the Act that presents an Article III case or controversy.[93] Clark's suit may not be dismissed on standing grounds so long as he presents a "personal stake" equal to that presented in *Flast* or *Trafficante*. That, I think, he has done.

## V

There seems to be no demurrer to my view that Clark's complaint mirrors a "person stake" endowed with sufficient immedi-

**83.** *Supra* note 78.

**84.** See Jaffe, *The Citizen as Litigant in Public Actions: The Non-Hohfeldian or Ideological Plaintiff*, 116 U.Pa.L.Rev. 1033 (1968); *Standing to Secure Judicial Review: Public Actions*, 74 Harv.L.Rev. 1265 (1961). *Cf.* Scott, *Standing in the Supreme Court—A Functional Analysis*, 86 Harv.L.Rev. 645, 692 (1973).

**85.** Compare the majority's reliance on *Flast*, 418 U.S. at 175, 94 S.Ct. at 2945–2946, 41 L.Ed.2d at 687, with Justice Powell's concurring opinion, *id.*, at 180–181, 94 S.Ct. at 2948–2949, 41 L.Ed.2d 690–691, calling for discard of the *Flast* test but reaffirming that the injury required there "is now the controlling definition of the irreducible Art. III case-or-controversy requirements for standing." *Id.* at 181, 94 S.Ct. at 2949, 41 L.Ed.2d at 691.

**86.** And what precipitated Justice Harlan's dissent in *Flast*; see 392 U.S. at 119–120, 88 S.Ct. at 1962–1963, 20 L.Ed.2d at 973.

**87.** *Flast v. Cohen, supra* note 78, 392 U.S. at 101, 88 S.Ct. at 1953, 20 L.Ed.2d at 962; compare *United States v. Richardson, supra* note 79, 418 U.S. at 173, 94 S.Ct. at 2944–2945, 41 L.Ed.2d at 686 (Burger, C. J.) with *id.*, at 195, 94 S.Ct. at 2955–2956, 41 L.Ed.2d at 698–699 (Powell, J., concurring).

**88.** See K. Davis, Administrative Law of the Seventies, § 22.02–10 at 508 (1976).

**89.** *Supra* note 78.

**90.** 42 U.S.C. § 3610(a) (1970).

**91.** 409 U.S. at 209–210, 93 S.Ct. at 367, 34 L.Ed.2d at 419.

**92.** Compare *id.* at 211–212, 93 S.Ct. at 367–368, 34 L.Ed.2d at 420 (Douglas, J.) with *id.* at 212, 93 S.Ct. at 368, 34 L.Ed.2d at 421 (White, J., concurring). See also *Flast v. Cohen, supra* note 78, 392 U.S. at 132, 88 S.Ct. at 1969, 20 L.Ed.2d at 980 (Harlan, J., dissenting). See also *Gray v. Greyhound Lines East Div.*, 178 U.S.App.D.C. 91 at 97, 545 F.2d 169 at 175 (1976); *Waters v. Heublein, Inc.*, 547 F.2d 466 at 469–470 (9th Cir. 1976).

**93.** See text *supra* at notes 33, 77.

acy to satisfy the dictates of Article III. In the opinion of Judge Leventhal,[94] however, and of the majority of the court as well,[95] the existence of a case or controversy is not enough to compel our cognizance of the case at bar, on grounds that it lies within our discretion under the Declaratory Judgments Act [96] to decline to hear it.[97] Judge Leventhal would dismiss the case in the hope—the fulfillment of which is in no way foreshadowed by this record—that Congress may at some later date confine or structure its power to veto regulations proposed by the Commission.[98]

**94.** See Leventhal, J., concurring, 182 U.S.App. D.C. at —, 559 F.2d at 659–662.

**95.** Maj.Op. at note 10.

**96.** 28 U.S.C. §§ 2201–2202 (1970).

**97.** Clark requests injunctive as well as declaratory relief. See Complaint at 9. Like Judge Leventhal, see Leventhal, J., concurring, 182 U.S.App.D.C. at — n.6, 559 F.2d at 660 n.6, I perceive no irreparable harm that might justify injunctive relief. At all events, the effect of relief of either stripe will be virtually indistinguishable. Cf. *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 602 n. 16, 95 S.Ct. 1200, 1207 n. 16, 43 L.Ed.2d 482, 491 n. 16 (1975).

**98.** See note 72 *supra.*

**99.** 28 U.S.C. § 2201 (1970), provides:
In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.
Cf. e. g., *Public Affairs Press v. Rickover*, 369 U.S. 111, 112, 82 S.Ct. 580, 582, 7 L.Ed.2d 604, 606 (1962); *Eccles v. Peoples Bank*, 333 U.S. 426, 432, 68 S.Ct. 641, 645, 92 L.Ed. 784, 789 (1948); *Lampkin v. O'Connor*, 123 U.S.App. D.C. 371, 375, 360 F.2d 505, 509 (1966).

**100.** Declaratory relief may be inappropriate when proceedings elsewhere pending must reach the question presented; *Samuels v. Mackel*, 401 U.S. 66, 73, 91 S.Ct. 764, 768, 27 L.Ed.2d 688, 693–694 (1971); *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 495, 62 S.Ct. 1173, 1175, 86 L.Ed. 1620, 1625 (1942); *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826, 829 (1941); *Newport News Co. v. Schauffler*, 303 U.S. 54, 56, 58 S.Ct. 466, 467, 82 L.Ed. 646, 648 (1938). Cf. *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 299–300, 63 S.Ct. 1070, 1073–1074, 87 L.Ed. 1407, 1411–1412 (1943);·

As a preliminary matter, this position may overstate somewhat the breadth of the discretion bestowed by the Declaratory Judgments Act. Its permissive language confers some discretion,[99] yet discretion has historically been exercised in but a relatively few discrete situations.[100] These categories are analogous to, though not coextensive with, the various prudential doctrines asserted under other heads of federal jurisdiction.[101] Moreover, whatever their breadth, they do not countenance refusal of jurisdiction merely because "the dispute relates to the existence of a 'mutable fact'

when that question implicates a statute construction of which is the task of another tribunal; *Albertson v. Millard*, 345 U.S. 242, 73 S.Ct. 600, 97 L.Ed. 983 (1953); *Federation of Labor v. McAdory, supra* note 72, 325 U.S. at 460, 65 S.Ct. at 1389, 89 L.Ed. at 1733–1734; *Newport News Co. v. Schauffler, supra*; when, though the legal issue remains, occurrences since the filing of the suit dictate reevaluation of the necessity for decision; *Ellis v. Dyson*, 421 U.S. 426, 434–435, 95 S.Ct. 1691, 1696, 44 L.Ed.2d 274, 282–283 (1975); *Steffel v. Thompson, supra* note 60, 415 U.S. at 459 n. 10, 94 S.Ct. at 1216 n. 10, 39 L.Ed.2d at 515 n. 10; *Golden v. Zwickler*, 394 U.S. 103, 108–110, 89 S.Ct. 956, 959–960, 22 L.Ed.2d 113, 117–119 (1969); *Mechling Barge Lines, Inc. v. United States*, 368 U.S. 324, 330–331, 82 S.Ct. 337, 341–342, 7 L.Ed.2d 317, 322–323 (1961); when "administrative intention is expressed but has not come to fruition or . . . that intention is unknown"; *Eccles v. Peoples Bank, supra* note 99, 333 U.S. at 434, 68 S.Ct. at 646, 92 L.Ed. at 790; *cf. Public Serv. Comm'n of Utah v. Wycoff Co., Inc.*, 344 U.S. 237, 245, 73 S.Ct. 236, 241, 97 L.Ed. 291, 296 (1952); or when courts are asked to assume the existence of facts neither present nor apparently incipient; *e. g., California Bankers Ass'n v. Shultz, supra* note 60, 416 U.S. at 56, 73, 94 S.Ct. at 1515, 1523, 39 L.Ed.2d at 837–838, 847; *Public Serv. Comm'n of Utah v. Wycoff Co., Inc., supra*, 344 U.S. at 242, 73 S.Ct. at 240, 97 L.Ed. at 295; *cf. Public Affairs Press v. Rickover, supra* note 99, 369 U.S. at 113–114, 82 S.Ct. at 582, 7 L.Ed.2d at 607, where the sweeping claims of plaintiff admitted of no answer, since they hinged on the presentation of facts unknowable on the record presented.

**101.** Justice Douglas has observed that decisions have often "brigaded" dispositions on ripeness or mootness grounds with expressions on the impropriety of declaratory relief. *Public Affairs Press v. Rickover, supra* note 99, 369 U.S. at 115, 82 S.Ct. at 583, 92 L.Ed. at 607 (Douglas, J., concurring).

[or] a 'changeable condition . . .' " [102] such as the possibility that Congress may voluntarily restrict the ambit of its own actions. [103] Even in the ordinary case, "where the only question is whether it is constitutional to fasten the administrative procedure onto the litigant, the administrative agency may be defied" and declaratory judgment had. [104]

In any event, we are not here presented with the usual case. I do not undertake a precise survey of the bounds of our discretion under the Declaratory Judgment Act because I cannot agree that we are permitted by Section 437h to avail ourselves of any such discretion. That section authorizes the institution of "such actions . . . including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of" the Act. [105] Judge Leventhal reads this as importing prudential and discretionary restrictions on justiciability into the special and expedited procedure that Section 437h prescribes. [106] The end result of that interpretation, as he acknowledges, is merely "that whatever the Court's ruling, it be announced earlier rather than later." [107] If, however, we are required by Section 437h, as construed in *Buckley*, to decide cases arising thereunder without prudential con-

siderations of ripeness and standing, [108] it seems anomalous to arrogate to ourselves a discretion to withhold decision on still other grounds.

In my view, the quoted language defines, not the prudential prerogatives, but the jurisdiction of the court functioning as the extraordinary Section 437h tribunal: it may hear only cases that raise constitutional questions as to provisions of the Act. This may be done, as the Section specifies, in "actions for declaratory judgment;" [109] if any other form of action is employed, it must be "appropriate" for the purpose. [110] I cannot infer from the statute congressional intent to indulge with the one hand the same leeway to refuse cases that Section 437h, according to *Buckley*, takes away with the other. This conviction is reinforced by the variously-stated rationales advanced for discretionary dismissals under the Declaratory Judgments Act, which are so similar to the very prudential grounds we are adjured to forego. [111] I do not see here the free hand claimed by my brethren.

### VI

I would, therefore, hold that Clark's case is justiciable. Accordingly, I dissent from the disposition chosen by the majority. As noted at the outset, however, I do not reach the merits at this time.

---

**102.** *Aetna Life Ins. Co. v. Haworth, supra* note 23, 300 U.S. at 242, 57 S.Ct. at 465, 81 L.Ed. at 622.

**103.** See note 72 *supra.*

**104.** *Public Utilis. Comm'n of California v. United States, supra* note 62, 355 U.S. at 539–540, 78 S.Ct. at 451, 2 L.Ed.2d at 475, distinguishing *Public Serv. Comm'n of Utah v. Wycoff Co., Inc., supra* note 100.

**105.** See 2 U.S.C. § 437h (Supp. V 1975), quoted in the Maj.Op. at note 2.

**106.** Leventhal, J., concurring, 182 U.S.App.D.C. at ——, 559 F.2d at 660; *Hecht Co. v. Bowles,* 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944), though indicative of judicial reluctance to surrender historic discretion in framing injunctive relief, cannot be invoked for the proposition that courts should begrudge congressional grants of jurisdiction. Indeed, the distinction between hearing a case and granting relief is drawn in *Hecht* itself, *id.* at 329, 64 S.Ct. at 591, 88 L.Ed. at 760. *Cf. id.* at 331, 64 S.Ct. at 592,

88 L.Ed. at 761 (Frankfurter, J., concurring). The citation of our remand for factfinding in *Buckley,* 171 U.S.App.D.C. 168, 169, 519 F.2d 817, 818 (1975), is similarly inapposite. That procedural decision is more in the nature of a reference to a special master—an analogue of the Supreme Court's practice in cases within its original jurisdiction—than of a prudential refusal to decide the case on the merits.

**107.** *Id.* 182 U.S.App.D.C., at ——, 559 F.2d at 661.

**108.** See Part II *supra.*

**109.** See text *supra* at note 105.

**110.** See text *supra* at note 105.

**111.** See note 100 *supra.* Recognition of this similarity is implicit in Judge Leventhal's enumeration of the factors guiding the discretionary decision. Leventhal, J., concurring, following note 10.

The rationale for this forebearance is twofold. Given the grave consequences of any resolution of the issues this case presents, it bespeaks no excess of caution to venture no opinion thereon until one is needed. As no judge in the majority touches the merits, any examination on my part would constitute the sheerest of dicta, and it goes without saying that I am chary of any such utterance in this large matter. The second and more important reason is that the Commission's argumentative presentation in this court neglected entirely the merits of the claims Clark asserts. Thus there has been no vigorous, full-bodied development of the complex issues involved.

Not the least of the critical problems lurking behind any disposition on the merits is the difficulty of framing a decision with sufficient precision to avoid *sub silentio* invalidation of the numerous statutes containing various sorts of congressional oversight provisions.[112] In this, however, we are not unlearned. To be sure, all parties to this litigation should give the issues emerging their just due, and a call for the assistance of knowledgeable amici curiae is singularly appropriate. But these aids are for the asking, and can be promptly summoned to enable us to confront the task. Already our ability to avoid the shoals of broad dicta[113] is enhanced by our knowledge of the construction of other oversight provisions.[114]

The purpose of the expedited review provision[115] that brings this case before us is to expedite decision of the constitutional issues it raises so that the Commission can get on with the important business of regulating federal elections. For as long as the decision is postponed, injury to Clark and all other voters—clear beneficiaries of the Act—must be endured. I would retain this case on the docket, have counsel for the Commission and amici curiae address the merits, and give the issues the resolution they deserve.

MacKINNON, Circuit Judge, dissenting:

Because the appellant Ramsey Clark originally presented a ripe justiciable case and controversy to this court, involving an issue the majority admit has been evading review for 40 years (Maj.op., 182 U.S.App.D.C. at ——, 559 F.2d at 649), it is my view, even if his loss in the primary election did moot his case as a candidate, that we should decide the merits of this case because of his standing as a voter. We have authority in certain instances to decide cases where our initial jurisdiction is lost, if the issue is one that is capable of repetition and likely to evade review. Also because Clark has standing as a voter and the facts relevant thereto do present a ripe justiciable case and controversy, it is my opinion that we should not exercise an adverse discretion to refuse to decide the important issues. If further briefing is desired that can easily be requested. I see no reason to avoid reaching the merits just because the defendants refused to brief the principal question adequately.

The majority entirely ignores a most important part of plaintiff's case. This is that, even if no veto power is actually exercised, the regulations that the FEC will propose are necessarily the result of the congressional threat to employ an unconstitutional legislative scheme. The reason is simple: with a potential veto to its regulations by either house, the Federal Election

---

**112.** See Maj.Op., 182 U.S.App.D.C. at ——, 559 F.2d at 649–650.

**113.** It seems certain that some congressional oversight provisions are constitutional. See Maj.Op., 182 U.S.App.D.C. at —— n.5, 559 F.2d at 648 n.5, citing *Sibbach v. Wilson & Co.*, 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941). It may be that all such provisions, which occur in bewildering variety, are valid. In any event, since neither we nor any other court will be called upon to review simultaneously the entire

lot, the necessity for decisional precision is no more peculiar to this case than to any other.

**114.** See Congressional Research Service, Congressional Review, Deferral and Disapproval of Executive Actions: A Summary and Inventory of Statutory Authority (1976) (collecting several hundred such provisions).

**115.** 2 U.S.C. § 473h (Supp. V 1975); see Maj.Op. at n. 2.

Commission (FEC) knows that it is useless to send over proposed regulations that a bare majority of a quorum in either house disapproves. To avoid this, the Commission as a practical matter is required to consult with members of each house, which here resulted in bringing in the members of Congress as participants in the actual drafting of the regulations of a supposedly independent agency that are to be applied to congressional and presidential elections.[1] Such consultation actually happened here (Brief for Appellant at 58–59) and is uncontested on the record.

The majority comments:

Significantly, the United States did not claim that the regulations which were propounded and referred and recently lay before Congress under the challenged review provisions are tainted with political interference.

1. There is a substantial difference between congressional influence in promulgating regulations for executive agencies which apply to the general public and to those which apply to the election of its own members.

2. The subtle nature of congressional influence and the possible subservience of the Commission to congressional control is evidenced by the present situation. The law provides that the Commission may promulgate regulations and file them with Congress and if Congress does not act upon them within 30 days of actual sessions they shall become effective. 2 U.S.C. § 438(c); 26 U.S.C. §§ 9009(c), 9039(c) (no provision for approval). Within this statutory time framework the Commission after long consideration on August 3, 1976 (Joint Stipulation ¶¶ 73, 79) issued its regulations and filed copies thereof with the Congress to lay over for 30 days. However, Congress adjourned "early on October 2nd." N.Y. Times, Oct. 3, 1976, at 1, col. 4. This overrun into October 2nd was a continuation of the last legislative day of October 1, 1976. Thus the election regulations that the Commission had worked on so diligently and for so long a time never became effective; and of course the majority argue the makeweight that Congress never vetoed them. This is all correct but the true meaning of these circumstances is obscured.

The Commission knew as early as January 22, 1976, that the Congress intended to adjourn on October 2nd. The Senate Majority Leader, Senator Mansfield, had inserted that fact in the Congressional Record on January 22, 1976, as part of the majority conference statement of

Maj.Op., 182 U.S.App.D.C. at ——, 559 F.2d at 647. But the compelled consultation produced the taint. To require proof of actual interference with the content of specific regulations is far too severe a burden to impose in this case. To the extent that any congressional influence is successful, it may be too subtle or too involved with lengthy discussions to pinpoint.[2] Influence may even result from suggestions inferred from casual statements made by Congressmen without any formal discussions. Legislation can be like that.

The point is that the congressional veto scheme, whether exercised or not, makes Congress a working party in the executive functioning of the agency, impinges upon the free judgment of the Commission, and necessarily operates to make the Commission subservient to views that may be communicated directly or indirectly from Congress, to such an extent that an agency that is held out as being free to regulate federal

the Majority Leader. His statement on that included the following:

We will have six recesses, including two for the national conventions, between now and October 2, the date on which we expect to adjourn for the national elections campaign. 122 Cong.Rec. S368 (daily ed. Jan. 22, 1976).

It is thus very apparent that when the Commission filed its regulations on August 3, all Congress had to do to avoid them was to do nothing and jockey a couple of legislative days; and that is what happened. It was known on August 3 that the congressional schedule for the remainder of the session until October 2 left 44 possible legislative days. The first day of the layover would not begin until the day after the filing. Next, eight days were absorbed by the Republican Convention. An additional recess during the Labor Day weekend consumed another 2 legislative days. There were 3 days when the Senate sat but the House did not and there was one day when the House sat but the Senate did not. This accounts for 15 days which are subtracted from the 44 legislative days that were available leaving 29 days and thus one day short of the 30 days. Thus regulations that the Congress did not wish to become effective did not become effective by virtue of circumstances wholly within the control of Congress. Just convening the House for one day of the three when the Senate was sitting would have caused the regulations to become effective. Thus, the temporary effect of a veto was accomplished not by a naked veto but by subtle indirection.

elections in the public interest is actually obstructed in that task by some of the parties its regulations are supposed to govern.

The plaintiff and intervenor have alleged that they are harmed by the veto provision of the statute, and that allegation must be assumed to be accurate at this stage. If the statutory existence of that naked power is illegitimate, its influence leading to palpable harm must be stopped. That is not to say that a case of arm-twisting must be made out; it is patent that the very scheme of having to please practically every member of both houses because a bare majority of a quorum of each house of Congress can eventually veto any regulation, leads the Commission into the possibility, or temptation, of subordinating its best executive judgment to that of Congress.

Hence, even without the actual exercise of a single-house veto, the structure the statute requires for adopting regulations, and the instant factual circumstances, present all the facts necessary to find the veto scheme to be constitutionally impermissible. No further "full-bodied record" is necessary to present the issue in concrete form for judicial decision. Note first the present harm of which plaintiff complains.

## I. THE HARM FROM THE FEC PROPOSED REGULATIONS

The Federal Election Commission, following oral argument, publicly announced that it intends to enforce the proposed regulations as advisory, quasi-regulations.[3] If the

majority contends that even after that fact there is insufficient present impact to afford standing, it should be noted that the very fact that the regulations are *not* actually in full force provides sufficient adequate present harm for standing purposes. Plaintiff Clark, as a voter, has a right to participate in an election conducted either according to FEC regulations or not, as a proper, constitutional process might determine to be appropriate. Halfway measures are not sufficient. Such entitlement is "arguably within the zone of interests to be protected . . . by the statute." *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970) (hereafter, *ADP v. Camp*). Clark has been harmed as a result of having the FEC regulations delayed to the extent that they never came into existence during the past election (Brief for Appellant at 57–58).

To argue that there is nothing the matter with the lay-over provision itself and that the delay only stems from the lay-over period prescribed by that provision is to fail to deal with the full impact of the statute. There is (and was) delay *before* the FEC even sends its recommendations over to the houses of Congress. This delay is occasioned because of the potentiality of the one-house veto and the additional consultation with Congress that the Commission considers it must take to obviate it. If the only provision for review were the lay-over provision with the possibility of subsequent legislation (as in *Sibbach v. Wilson & Co.*,

---

**3.** An alternative view of the entire question might be that the quasi-regulations have sufficient present force, in the sense of affecting conduct, to present a ripe challenge as to their validity. If the FEC is successful in its proposed enforcement of these regulations at least to the extent of making candidates, who are wary of the appearance of skirting the new election requirements, abide by their provisions, then ample present impact would have been alleged. That the regulations are not officially in force would present a situation analogous to that in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), where the Supreme Court took cognizance of the fact that "petitioners deal in a sensitive industry, in which public confidence

in their drug products is especially important." 387 U.S. at 153, 87 S.Ct. at 1518. For that reason, ripeness was found, since it was unlikely that any drug company would risk the public reaction from being the test case. Similarly, few candidates could be expected to flout even the quasi-regulations of the FEC, lest they leave themselves open to attack from their challengers. *See also National Automatic Laundry and Cleaning Council v. Shultz*, 143 U.S.App.D.C. 274, 279–80, 283, 443 F.2d 689, 694–95, 698 (1971) (involving an interpretative letter as to the potential applicability of the Fair Labor Standards Act to the petitioner's industry; ripeness and standing both adequate).

312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941)), then the regulations would become effective unless both houses of Congress disapproved, and the President signed their alternative legislation. If he vetoed the congressional action it would take a two-thirds vote of both houses to impress the congressional will upon the Commission's action. That is the nature and extent of the influence assigned by the Constitution to Congress in the affairs of other agencies.[4] The one-house veto scheme violently disturbs the constitutionally prescribed congressional-executive balance intended to apply in such situations.

Considering the greatest power that the Constitution confers on *individual* members of Congress, the constitutionally prescribed process would permit one third of the members of a bare quorum in one house (18 Senators *or* 73 Representatives) to *sustain* a presidential veto of a bill setting aside any regulations. To sustain the FEC regulations under the one-house veto provision would, at a minimum, take a majority of a quorum of *both* houses (26 Senators *and* 110 Representatives), and if all members voted, 51 Senators *and* 218 Representatives. This is a tremendous shift in voting power. Thus, if the constitutionally established legislative procedure was followed, a commission would very logically anticipate reversal of its regulations in far fewer cases than if a bare majority of a quorum of just *one* house of Congress (26 Senators or 110 House members) could possibly *defeat* its proposed regulations. Hence, under the one-house veto provision of the instant Act there is more need for the Commission to confer with and *defer* to a single house of Congress than in the case of a simple lay-over provision. The one-house veto greatly increases the authority of a small *minority* of the entire Congress to achieve a legislative result, when compared with the constitutionally prescribed legislative procedure.

Harm to the constitutionally devised legislative process also results from both conferring with and deferring to Congress in advance of agency action. The majority opinion raises the question, in footnote 10, that the one-house veto might reflect no greater intrusion than the usual relationship between a regulatory commission and its funding congressional committee. As above pointed out this assertion is wide of the mark. If that were all that was intended the elaborate veto scheme, and the other control features, need never have been enacted. But from the very beginning the Act was dripping with features that sought to exert congressional control over the normal functioning of the Commission. Congress' appointing a majority of four of the six members of the original Commission was just one example of the intent to intrude into the actual freedom of the Commission to follow the statute.

On the point of the congressional interference with agency functions, Chief Judge Bazelon in *D. C. Federation of Civic Associations v. Volpe*, 148 U.S.App.D.C. 207, 459 F.2d 1231 (1971), *cert. denied*, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972) (in an earlier opinion in which case, Judge Wright joined, 140 U.S.App.D.C. 162, 434 F.2d 436 (1970)), held agency action was unlawful where it was allegedly influenced by a *sin-*

---

**4.** Footnote 6 of the majority opinion resorts to an incorrect comparison of *Sibbach, supra,* and the instant case, and ignores their complete dissimilarity. This case has a lay-over *and a one-house veto.* There is nothing wrong with a lay-over provision, be it 30 days or six months. This can allow Congress to act in a constitutional manner through both houses and the President and that is permissible. But the one-house veto is not a "difference . . . of degree"—it is a completely different method of accomplishing a legislative result by a congressional procedure *not* authorized by the Constitution; *i. e.,* by one house instead of by two houses and the President.

That the unconstitutional procedure (the one-house veto, not the lay-over) may *also* influence legislation is not to be equated with the influence or action that Congress may exercise or resort to during a simple lay-over provision. There may be a difference only in degree between the influence of a 30 day lay-over and a six months lay-over, but there is a radical difference in *kind* between the influence of a *one-house veto* and any simple lay-over provision. The former is invalid, the latter is valid, for the reasons herein outlined.

*gle Congressman* : "Even if the Secretary [of Transportation] had taken every formal step required by every applicable statutory provision, *reversal would be required, in my opinion, because extraneous [congressional] pressure intruded into the calculus of considerations on which the Secretary's decision was based.*" 148 U.S.App.D.C. at 221–222, 459 F.2d at 1245–6 (emphasis added). Yet here the majority do not even take cognizance of much greater intrusion.

Even at its worst, the normal congressional relationship always acts *in futuro.* A congressional committee can tell the Commission to adopt particular activity or its next appropriation would be reduced. Such does not involve any *immediate* intervention into regulatory action. The veto scheme in the Federal Election Campaign Act does. And that difference is crucial. The *delay* of which plaintiff here complains resulted directly from the extra time taken by the Commission to confer with members of Congress *on these very proposals* and the admitted effect of this scheme is that "extraneous pressure intruded into the . . decision . . .," a tactic which the court found so wrongful in *D. C. Federation,* but ignores here. In the normal functioning of agencies, there might be some conferring with Congress, but a failure to do so, or to conform to congressional requests, could only involve future adverse legislation involving the Commission. It would not absolutely prevent a Commission from promulgating timely rules it considered to be necessary in the public interest.

Plaintiff also complains of the potential that the regulations will favor incumbents if a greater amount of consultation with Congress is required. Here again, the one-house veto provision creates a special harm. There is always some deference to Congress, but the personnel of its committees do not have life-and-death power over an agency's ability to adopt precise regulations

it considers to be necessary. If the committee threatens to retaliate unless a commission takes a particular point of view, the commission weighs that threat in light of its application only in the future, and the myriad intervening political factors or accommodations that could still prevent adverse legislation. Indeed, the Commission could seek to have an appropriation bill amended when it came to the floor, to reinstate the cut-off funding (a difficult matter against a Rules Committee rule, but far less difficult on the Senate floor). None of this saving-potential is available in the one-house veto case. When exercised by a majority of a quorum of *one house only,* the regulation is dead. Congress has made itself a virtual partner with the Federal Election Commission in the adoption of every regulation. That naked intrusion violates the basic three branch constitutional scheme for our Government and the legislative scheme provided by art. I, sections 1, 7 of the Constitution.

## II. IS THE HARM SUFFICIENT TO GIVE STANDING?

No regulations have been finally promulgated under authority of the present Commission. The only proposals to date failed by two days to become law.[5] The only exercises of the one-house veto power by a house of Congress fell on regulations proposed by the old Commission, which was improperly constituted. Nevertheless, this shows the potential for congressional disagreement with rules the Commission considers to be essential to fair elections. If Congress would exercise its veto powers over regulations issued by a commission of which it appointed a *majority* of the members, the potentiality for a veto of regulations issued by a constitutionally appointed independent commission is even more likely.[6]

5. Nevertheless, harm has resulted from *not* having those regulations which the unconstitutional scheme prevented from becoming effective, *see* note 2 *supra.*

6. Judge Leventhal's concurring opinion contends (182 U.S.App.D.C. at —— n.1, 559 F.2d at 658 n.1) that if the Commission has greater independence from Congress then Congress is less likely to exercise its veto power. However, it is more likely that if the Commission is

The harm complained of, therefore, is not that any regulation is now in force that violates the Constitution by excluding the President and the Congress from their prescribed participation. It is rather that no regulations are now in force and that the scheme of the Act makes it possible for a *bare* majority of a quorum (which frequently occurs) in *either house* of Congress to influence regulations constituting "*rules of law*," while completely depriving the President, possibly one house of Congress, and one-third plus one of the members of each house, from exercising legislative power supposedly vested in them by the Constitution. Short reflection upon the enormity of these constitutional violations will convince anyone of the tremendous harm they cause to the basic procedures that the Constitution provides for the enactment of legislation to govern the Nation.

*Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), held that "Congress may not confer jurisdiction on Art. III federal courts to render advisory opinions . . . [b]ut where a dispute is otherwise justiciable, the question whether the litigant is a 'proper party to request an adjudication of a particular issue,' . . . is one within the power of Congress to determine." 405 U.S. at 732 n. 3, 92 S.Ct. at 1365 n. 3 (1972). Here, 2 U.S.C. § 437(h) has given standing in the *Sierra Club* sense to any eligible voter. As noted above, this is a very clear case of what *ADP v. Camp, supra,* meant by a statute creating a zone of interests to be protected. Hence, if the *controversy* satisfies the Article III requirement, there should be no quibble over permitting Clark, as voter, to bring this action, arguing the voter's interest in *constitutional* regulations constituting rules of law governing elections of Presidents, Senators and Representatives.

One problem with seeing this controversy as within Article III is, once again, the fact

that no regulations have been adopted. But Clark is not objecting to any particular regulation. His objection is to the unconstitutional statutory procedure to which any and all proposed Commission regulations *have been* and will be subjected. He complains that that portion of the statute is facially invalid. The complained of procedure has run its course. The potential for congressional influence on the proposed FEC regulations has operated. And, most importantly, the issuance of the regulations was delayed and the past election was conducted without them. The complaint fairly alleges that the FEC would have sent its recommendations over two days earlier except for the extra consultation time considered necessary because of the possibility of a one-house veto.

Voter Clark contends that the Federal Election Campaign Act was intended to provide such regulations (constitutional regulations, not reflecting undue influence of a single branch) as the Commission considered necessary for the protection of his franchise. The protection of an *unadulterated franchise* was precisely the interest deemed sufficient to give standing in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). But Clark and all other voters were forced to do without having the benefit of the fair play of the election regulations which the properly constituted regulatory commission found *necessary* for this election. The Commission with respect to its regulations is thus always completely subservient to a bare majority of a quorum of *one* house. Such a bare majority is given the power to accomplish what the Constitution otherwise requires of a two-thirds majority in *both* houses. This enhanced legislative authority for a bare majority of a quorum of *one house* to take positive legislative action clearly violates the constitutional requirement that legislation should be passed by both houses [7] and be signed by

---

a fully independent agency its regulations will be *less* responsive solely to the interests of Congressmen and hence will call for greater exercise of the one-house veto and the influence it breeds.

7. All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives.

U.S.Const. art. I, § 1.

the President.[8] Art. I, sections 1, 7. The Constitution confers "*All* legislative powers" on both houses and does not permit a single house to usurp the constitutional legislative power of "Congress." [9]

That the failure of these regulations to become effective was prejudicial to plaintiff, as a voter, is also apparent from an examination of the complete set of regulations, governing the conduct of federal elections, which the Commission filed on August 3, 1976. An examination of those regulations discloses numerous proposed features which would have benefited candidates who opposed incumbents, including limitations on honoraria for federal *elected* officials,[10] a strict accounting requirement for use of facilities furnished by labor organizations (which are generally considered to have the support of a larger number of favorable incumbents than in any Congress in recent history),[11] the necessity for reimbursement *in advance* of airplane travel services furnished by a corporation or a labor organization,[12] and the necessity to report all in-kind contributions.[13] Incumbents generally find it easier to obtain con-

**8.** 2. Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law. But in all such Cases the Votes of both Houses shall be determined by yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively. If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a law, in a like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law.
3. Every order, resolution, or vote to which the concurrence of the Senate and the House of Representatives may be necessary (except on a question of adjournment) shall be presented to the President of the United States; and before the same shall take effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the rules and limitations prescribed in the case of a bill.
U.S.Const. art. I, § 7, cl. 2, 3.

**9.** Judge Leventhal's concurring opinion at n. 13 relies on its conclusion that the Congress and the Commission, as its agent, are exercising "legislative power." The trouble with this construction is that while Congress may have agents to inform it of facts so as to better exercise its legislative power (as does the office of the Comptroller General), it may not *directly share* with an agent the exercise of the legislative power conferred solely on Congress by the Constitution. It is thus impermissible for Congress in effect to confer the status of a congressional enactment upon any agency regulation which both houses approve either by an affirmative vote to that effect, or by a majority vote of both houses that refuses to veto the "rule of law" in any regulation. When Congress so acts it effectively confers the status of a "bill" on the proposed regulations, and constitutes them "rules of law" without subjecting them to the legislative procedures required before a "bill" may become a "rule of law." The Commission in so proposing regulations exercises greater power than any Senator or Representative. Their bills must be passed by both houses, approved by the President, etc.

In *National Cable Television Ass'n v. United States*, 415 U.S. 336, 341–342, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974), the Supreme Court held that if what the statute attempted was in effect a delegation of the legislative taxing power in the guise of setting fees for regulated companies, even though the statute contained "standards," serious constitutional problems would be raised.

Under the legislative scheme here and established congressional procedures, "the concurrence of the [*votes* of the] Senate and House of Representatives [to any regulation] [is] necessary . . ." in some form before any regulation may become effective, and therefore the statute violates art. I, section 7, clause 3 (*see* note 7) because it provides for regulations that have passed such procedure to become effective as "rules of law" without being "presented to the President of the United States [etc.]."

**10.** Proposed FEC Reg. § 110.12, 41 Fed.Reg. 35952 (Aug. 25, 1976).

**11.** Proposed FEC Reg. § 114.9(b), 41 Fed.Reg. 35961 (Aug. 25, 1976).

**12.** Proposed FEC Reg. § 114.9(e), 41 Fed.Reg. 35962 (Aug. 25, 1976).

**13.** Proposed FEC Reg. § 104.3, 41 Fed.Reg. 35942 (Aug. 25, 1976).

tributions than do challengers. While less harsh than they might have been, absent congressional influence, these proposed regulations were still sufficiently onerous that the incumbents might well have preferred postponing their official applicability; and their existence might have exposed information that would have changed election results.

Clark has standing as a voter. The statute specifies that voters are proper persons to challenge its constitutionality.[14] He has been denied the statute's intended benefit: an election guided by regulations which an independent Commission thought were necessary, *when* that Commission thought they were necessary.

The delay was directly connected with the legal infirmity alleged: an unconstitutional potential for the Commission's deference to Congress during the time the issuance of the regulations was being delayed by congressional consultations. Even while recognizing the regulations' possible reflection of congressional influence, Clark prays for the issuance of some regulations. A holding by this court that the one-house veto is unconstitutional, and severable from the rest of the Act, would immediately make operative the FEC regulations, thus affording Clark the relief he seeks—though belated. They would immediately cover special congressional elections such as to fill Representative Bergland's slot in Minnesota when he resigns to take office as Secretary of Agriculture. Clark's interest as a voter has not changed.

## III. THE UNCONSTITUTIONALITY OF THE ONE–HOUSE VETO

In one of the concurring and dissenting opinions in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the following is stated:

> I am also of the view that the otherwise valid regulatory power of a properly created independent agency is not rendered constitutionally infirm, as violative of the President's veto power, by a statutory provision subjecting agency regulations to disapproval by either House of Congress. For a bill to become law it must pass both Houses and be signed by the President or be passed over his veto. Also, "Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary . . ." is likewise subject to the veto power. Under § 438(c) the FEC's regulations are subject to disapproval [by one-house of Congress]; but *for a regulation to become effective, neither House need approve it, pass it, or take any action at all with respect to it. The regulation becomes effective by non-action. This no more invades the President's powers than does a regulation not required to be laid before Congress.* Congressional influence over the substantive content of agency regulation may be enhanced, but I would not view the power of either House to *disapprove* as equivalent to legislation or to an order, resolution or vote requiring the concurrence of both Houses.

424 U.S. at 284–85, 96 S.Ct. at 757 (White, J.) (emphasis added, footnotes omitted). The relevance of this statement to the issues here involved, the sense of finality it imports, and the prominence of the author, require an analysis of its grounds if anyone is to assert a contrary position. The key phrase in that opinion (hereafter "concurring opinion") asserts that under section 438(c) for an FEC regulation to become effective "neither House need approve it, pass it, or take any action at all with respect to it." To so state is to ignore the actual situation created in Congress by the scheme of the Federal Election Campaign Act: (1) What section 438(c) really means in congressional practice is that, for an FEC regulation to become effective *both* houses *must* approve it by voting *not* to veto it. (2) Under the statutory scheme of the Federal Election Campaign Act, that is the legislative equivalent for that house of "passing" the regulation. (3) And to state that a proposed regulation may become ef-

**14.** 2 U.S.C. § 437h(a) (Supp. V, 1975).

fective without any house taking "any *action* at all with respect to [the regulation]" (emphasis added) is to assume that Congress will act irresponsibly and fail even to consider regulations embodying "rules of law" that Congress has statutorily required be submitted to it, subject to "appropriate action." (Section 438(c)(2)).[15] The congressional procedures are fully described in note 17 *infra*.

The next assertion in the concurring opinion is that, "The regulation becomes effective by *nonaction*." (Emphasis added.) This is merely a reiteration of the preceding sentence, discussed *supra*, and embodies the same fallacious factual assumptions just de-

scribed. To term the action of Congress in affirming a regulation by *not* vetoing it as "nonaction" is to ignore that somewhere along the congressional pipeline it *always* takes some sort of affirmative action by Congress to create such result.

Then comes the statement that, "This [failing to veto a regulation] no more invades the President's powers than does a regulation not required to be laid before Congress." Fifty per cent of this statement amounts to a truism, based on a false assumption. The remaining 50 per cent of the situation, that the statement does not deal with, renders the entire statement nugatory.

---

**15.** The veto provisions of the Act are contained in 2 U.S.C. § 438(c), *as amended by* the Federal Election Campaign Act Amendments of 1976, Pub.L. No. 94–283, 90 Stat. 486:

(c) Proposed rules or regulations; statement, transmittal to Congress; Presidential elections and Congressional elections; "legislative days" defined

(1) The Commission, before prescribing any rule or regulation under this section, shall transmit a statement with respect to such rule or regulation to the Senate or the House of Representatives, as the case may be, in accordance with the provisions of this subsection. Such statement shall set forth the proposed rule or regulation and shall contain a detailed explanation and justification of such rule or regulation.

(2) If the appropriate body of the Congress which receives a statement from the Commission under this subsection does not, through appropriate action, disapprove the proposed rule or regulation set forth in such statement no later than 30 legislative days after receipt of such statement, then the Commission may prescribe such rule or regulation. In the case of any rule or regulation proposed to deal with reports or statements required to be filed under this subchapter by a candidate for the office of President of the United States, and by political committees supporting such a candidate both the Senate and the House of Representatives shall have the power to disapprove such proposed rule or regulation. Whenever a committee of the House of Representatives reports any resolution relating to any such rule or regulation, it is at any time thereafter in order (even though a previous motion to the same effect has been disagreed to) to move to proceed to the consideration of the resolution. The motion is highly privileged and is not debatable. An amendment to the motion is not in order, and it is not in order to move to reconsider

the vote by which the motion is agreed to or disagreed to.

The Commission may not prescribe any rule or regulation which is disapproved under this paragraph.

(3) If the Commission proposes to prescribe any rule or regulation dealing with reports or statements required to be filed under this subchapter by a candidate for the office of Senator, and by political committees supporting such candidate, it shall transmit such statement to the Senate. If the Commission proposes to prescribe any rule or regulation dealing with reports or statements required to be filed under this subchapter by a candidate for the office of Representative, Delegate, or Resident Commissioner, and by political committees supporting such candidate, it shall transmit such statement to the House of Representatives. If the Commission proposes to prescribe any rule or regulation dealing with reports or statements required to be filed under this subchapter by a candidate for the office of President of the United States, and by political committees supporting such candidate it shall transmit such statement to the House of Representatives and the Senate.

(4) For purposes of this subsection, the term "legislative days" does not include, with respect to statements transmitted to the Senate, any calendar day on which the Senate is not in session, and with respect to statements transmitted to the House of Representatives, any calendar day on which the House of Representatives is not in session, and with respect to statements transmitted to both such bodies, any calendar day on which both Houses of the Congress are not in session.

(5) For purposes of this subsection, the term 'rule or regulation' means a provision or series of interrelated provisions stating *a single separable rule of law.*

(Emphasis added.)

As for the first 50 per cent—of course if Congress does nothing, it will *never* invade any powers of the President[16]; but to assert that Congress does nothing when the vote or action of Congress is to *not veto* a regulation is merely to play with words and to deny reality. Such interpretation of the legislative situation incorrectly describes what happens when Congress decides to *not veto* a regulation. That result is definite action—not "nonaction." It is not true that Congress does not act when it votes *not* to exercise its veto—in such cases it may act affirmatively by a majority vote to approve or the resolution to veto may not carry by the required majority. Either procedure would constitute an *act* or *vote* of approval for that house. In both instances votes are cast in the normal legislative manner by Congressmen elected to exercise "[a]ll legislative power." These two examples cover those situations where votes are cast on main motions (1) to veto, or (2) to approve (not veto), regulations transmitted by the Federal Election Commission. Set forth in the margin is a short summary of the congressional *action* which was taken when two regulations of the initial Commission were vetoed, one by the House and one by the Senate.[17] In both situations the indi-

**16.** It must also be emphasized that the President is not the only party with an interest in the veto power. As explained above, 182 U.S. App.D.C. at ————, 559 F.2d at 644–645, a presidential veto also greatly enhances the power of individual Congressmen. With a bare quorum voting it is within the power of a third of the members of each house (17 Senators and 73 Representatives) to uphold a presidential veto. If rejection of Commission regulations were to be accomplished by legislation, those few Congressmen, in either house, could prevent that rejection with the President's approval. But under the one-house veto scheme, it would *minimally* require a majority of a quorum (26 Senators *and* 109 Representatives) to prevent the rejection, even if the President were in agreement with them. The vices of the one-house veto scheme are as subtle as they are numerous.

**17.** Before *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), invalidated the former Federal Election Commission, there were two instances in which the one-house veto power was exercised. The congressional history of these two actions displays the full panoply of the law-making process, including committee reports, procedural motions, and final votes.

On August 1, 1975, the Chairman of the Federal Election Committee transmitted to the Speaker of the House proposed regulations to govern the location at which candidates would be obliged to file campaign reports and other documents to the Commission. 121 Cong.Rec. H8185 (daily ed. Aug. 1, 1975). The Speaker referred the proposal to the Committee on House Administration. On October 8, 1975, Congressman Wayne Hays submitted House Resolution 780 to veto those regulations. 121 Cong.Rec. H9889 (daily ed. Oct. 8, 1975). The Committee reported the next day, favoring approval of H.Res.780, in House Report No. 94–552. 121 Cong.Rec. H10035 (daily ed. Oct. 9, 1975). The Report was referred to the House Calendar. On October 20, 1975, Congressman Hays moved to suspend the rules to bring up H.Res.780 at once. 121 Cong.Rec. H10065 (daily ed. Oct. 20, 1975). The motion failed to receive the necessary two-thirds vote. 121 Cong.Rec. H10071 (daily ed. Oct. 20, 1975). The next day, the motion to bring up the veto as a special order was made by Congressman Pepper. 121 Cong.Rec. H10181 (daily ed. Oct. 21, 1975). That motion was agreed to the next day. 121 Cong.Rec. H10185 (daily ed. Oct. 22, 1975). Thereupon, Congressman Hays called the resolution up for debate, 121 Cong.Rec. H10187 (daily ed. Oct. 22, 1975), following which it was approved by the House, 121 Cong. Rec. H10198 (daily ed. Oct. 22, 1975); *i. e.*, the proposed regulation was vetoed by the House.

The other exercise of the veto power was in the Senate. It concerned disclosure of contributions to, and accounting of expenditures from, office accounts of Senators and Representatives. The Federal Election Commission had transmitted a proposed regulation to the President of the Senate on August 1, 1975. 121 Cong.Rec. S14944 (daily ed. Aug. 1, 1975). On October 6, 1975, another regulation on this topic was received by the President of the Senate. 121 Cong.Rec. S17553 (daily ed. Oct. 6, 1975). The journal of proceedings in the House recorded this communication on October 1, 1975, and characterized it as "a revised proposed regulation pertaining to accounts used to support the activities of federal office holders." 121 Cong.Rec. H9439 (daily ed. Oct. 1, 1975). The proposal was sent to the Senate Committee on Rules and Administration, which, after holding hearings, recommended Senate Resolution 275 to disapprove both the initial and the "new or revised" regulation. 121 Cong.Rec. S17553 (daily ed. Oct. 6, 1975). S.Rep.No.409, 94th Cong., 1st Sess. 2 (1975). The Committee Report was made by Senator Byrd, for Senator Cannon. On October 8, 1975, Senate Resolution 275 came up for debate. Senator Clark proposed to amend the resolution so as to approve the proposed regulations. 121 Cong.Rec.

vidual house plainly acted. Each house voted and *if these votes had gone the other way and the regulations had become effective, would anybody say such result had occurred by nonaction*? The mere fact that there were insufficient votes cast to approve does not permit a conclusion that either house did not act, *i. e.*, that the "regulation[s] became effective by nonaction."

A third procedure may eventuate under a one-house veto provision—it might happen that neither house would take a direct vote on the regulations within a statutorily set time period and the regulations would become effective on the last day of the period within which the statute required either house to act. This may be the situation that the concurring opinion mistakenly assumed would always occur when either house did not veto the proposed regulations. Under such circumstances the *refusal* of either house to act is just as much legislative *action* as if there had been affirmative majority votes of either or both houses to approve or to veto. The scheme of section 438(c) of the organic act of the FEC, operating on established congressional procedures, makes the refusal to act within the prescribed time schedule the equivalent of an affirmative legislative act.

In such cases, where neither house takes any action to affirmatively approve or to veto, there may however be any number of

votes by either house that determine that neither house would take further *action*. These votes might be in subcommittee, committee, the committee of the whole, the Rules Committee, or on the floor of either house, and might be taken on procedural motions or to defer consideration of the main motion to approve or veto. Voting down a Rules Committee rule calling for a debate on the proposed regulation and a subsequent vote on approval or veto might also be the action taken. *A negative vote in all such circumstances would obviously be effective legislative action.* So would an affirmative vote to adjourn either house or a committee when the effect of the vote would *finally* prevent either body from taking other action to approve or veto a proposed regulation in whole or in part.

The second 50 per cent of the statement in the concurring opinion wholly ignores the other side of the coin, *i.e.,* that section 438(c) confers the power on one house to *veto* regulations as well as to not veto them, and when one house does veto a regulation, it definitely is not engaged in "nonaction." Even the concurring opinion would admit this.

The concurring opinion states, however, that it does "not view the power of either House to disapprove [agency regulations] as equivalent to legislation or to an order, resolution or vote requiring the concurrence of both Houses." [18] If taking action to approve or disapprove any agency regulation,

S17876 (daily ed. Oct. 8, 1975). The amendment was defeated by vote of 47 yea, 48 nay. *Id.* at S17888. Thereupon, the resolution to veto was carried by voice vote. *Id.* at S17889.

After all this, suppose that the final vote in each instance went the other way. Most realistically, suppose that Senator Clark's amendment had one more vote in its favor and the regulations were approved, *i. e.*, not vetoed. Could it then be said, as the concurring opinion states, that the entire proceedings were "nonaction"? "Nonaction" is an incorrect description of what happens in the legislative process when Congress acts to approve regulations by not vetoing them. In each case, a single house of Congress determines whether a regulation would go into effect or not. A vote yes, just as a vote no, would follow significant congressional action. A vote yes, just as a vote no, would have a legislative result. The conduct of federal elections would be affected by either vote.

In the case of the Senate, the result is even clearer because of the submission of an original, followed by a revised, regulation. The Committee on Rules and Administration plainly considered itself as able to choose either, or neither, of the proposals. Had it recommended a veto of only one alternative, the other would have gone into effect and influenced conduct. (Actually, the Committee approved neither alternative, but in a move lending further support to the earlier discussion in this opinion of one-house influence upon the FEC, the Committee concluded its report with a list of guidelines that the FEC should follow if it wanted its recommendations *approved* (certainly an affirmative act) in the future. S.Rep.No.409, 94th Cong., 1st Sess. 3–4 (1975)).

18. 424 U.S. at 285, 96 S.Ct. at 757 (concurring and dissenting opinion).

which constitutes a "provision or series of interrelated provisions stating a single separable *rule of law*" (2 U.S.C. § 438(c)(5), 90 Stat. 486) (emphasis added), is not "the equivalent of legislation" what is it? (Judge Leventhal's opinion here contends it is legislative action (n. 13)). If it is not legislative action where does Congress derive its power to act? What provision of the Constitution gives Congress power to take action to approve or disapprove a "rule of law" if it is not its legislative power? (*id.*) Practically all of Congress' powers to act are limited to acting by legislation and that is the precise power that Congress is attempting to exercise when it passes on any regulation amounting to a "rule of law" under a one-house veto provision, whether by action or so-called "nonaction." Further, all legislation must conform to the two-house constitutional procedure required for legislation. *See* art. I.

The concurring opinion analogizes such a veto to the case of a bill passed in one house which fails in another. 424 U.S. at 285, n. 30, 96 S.Ct. 612, n. 30. In the latter case, however, each house of Congress is taking affirmative "action" that is specifically authorized and required by the Constitution, while the one-house veto of agency regulations is not. Furthermore, a bill that fails in one house does not automatically become law otherwise. It requires the approval of *both* houses *and* the President. A vote on a *bill* in one house is just *part* of the constitutional legislative *process*, while under the Constitution it takes the *entire* legislative procedure to repeal a regulation adopted by an agency. This difference is most simply understood by reference to the basic rule of the Constitution: laws must first pass *both* houses of Congress *and* be signed by the President. The Commission's regulations can become effective if neither house acts only because *both* houses of Congress have established certain standards and authorized the Commission to promulgate rules that conform thereto. That distinguishes the position of the Commission from that of a mere proposer of legislation. What are sent over by the Commission are not items in a proposed budget, but regulations

which, because they conform to the standards prescribed by law, are capable of having the full force of law with nothing more happening. Hence, to set aside those regulations also requires an Act of Congress having the full force of law.

So, if something more than "nonaction" is required, section 438(c) definitely does provide for such action. And to circumvent his veto power does invade the President's powers, because permitting one house to veto a proposed regulation is action which results in a situation that could only be accomplished under the Constitution by two houses passing a bill with the President's approval and subject to presidential veto and override. It is therefore clear that section 438(c) definitely invades presidential powers in authorizing a one-house veto, or as would be more appropriately stated, in authorizing FEC regulations to become effective by approval of both houses without reference to presidential action thereon. Moreover, it is plain that section 438(c) also violates art. I, section 1 of the Constitution which definitely places "[a]ll legislative power" in a Congress of *two* houses, except as otherwise provided in the Constitution, and does not permit one house *alone,* without the intervention of a presidential veto, to legislate as to what should or should not be the applicable "*rule of law*" embodied in a vital agency regulation.

The concurring opinion is also based on the assumption that, when a regulation becomes effective by what it terms "nonaction" of Congress, nothing happens in Congress. As shown above this is just not the fact—a great deal happens in Congress—and that is all "*action.*" The FEC regulations are just not delivered to Congress *sub silentio* and then ignored until they take effect. During the period that proposed regulations are "laid-over" they are continually accessible to each member of Congress and to the action of its committees and the subcommittees of each House. *See* note 17 *supra.* The regulations are under constant consideration. The first *action* is to refer the proposed regulation to the appropriate committees in the House

and Senate and if nothing further happens, that *action* is dispositive of the fate of the regulation.

Section 438(c) does encompass the extremely unlikely possibility that Congress may do nothing more than refer the proposed FEC regulations to the appropriate committees which may refuse to act further; but is also presents the practical certainty that Congress will be responsible and, as it already acted on the two past occasions when regulations were proposed by the first Commission, that it will vote to determine whether to approve or veto the regulations. It is submitted that the validity of the regulation should be determined on the assumption that Congress will generally act in the latter manner.[19] A practical certainty is generally to be preferred over an unlikely possibility. It thus does not accord with congressional procedures, or the scheme of the Federal Election Campaign Act, to base an opinion on the constitutionality of the one-house veto on the premise that FEC regulations become effective by nonaction of the Congress.

In approving regulations submitted by the FEC *the concurrence of both houses is necessary,* since if one house disagrees, the regulations are killed. Hence, such regulations must be presented to the President, in accordance with art. I, § 7, cl. 3: "Every order, resolution, or *vote* to which the concurrence of the Senate and the House of Representatives shall be necessary . . shall be presented to the President of the United States . . . according to the rules and limitations prescribed in the case of a bill." (Emphasis added.) *Congress cannot establish "rules of law" by a legislative scheme which by-passes the constitutional role of the President in law making.*

The harms specifically felt by plaintiff Clark are sufficient to give him standing to challenge the unconstitutionality at the core of the one-house veto device: the subversion of the constitutional legislative process.[20] Whether or not Clark's arguments would prevail over the view taken in the concurring opinion above quoted, "the issue tendered is a purely legal one," as in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), and no further factual background is required to resolve it.

## IV. A JURISDICTIONAL "STAYING OF HANDS"

Clark seeks declaratory relief in this suit which if granted, will resolve the rights of all similarly situated candidates under this Act.[21] On that basis alone, he must be

---

**19.** *See* note 17 *supra.* Even in the rare case where Congress did nothing regarding a veto, unconstitutional influence upon a supposedly independent commission from the threat of action, as discussed earlier in this opinion, is still a realistic possibility.

**20.** "[E]ven a miniscule . . . stake [there, a pecuniary one] of the litigant may be sufficient if he provides a suitable and effective vehicle for vindication of larger values." *National Automatic Laundry and Cleaning Council v. Shultz, supra* note 3, 143 U.S.App.D.C. at 278, 443 F.2d at 693.

**21.** In *Brockington v. Rhodes,* 396 U.S. 41, 90 S.Ct. 206, 24 L.Ed.2d 209 (1969), a plaintiff's challenge to a signature requirement for nomination was ruled to be moot. The Court found that the particular plaintiff had not asked for any relief which would inure to the benefit of others, and had himself lost standing by the passing of the election. Four distinct routes were suggested whereby the plaintiff might have been able to sustain his standing:

Rather, in view of the limited nature of the relief being sought, we think the case is moot because the congressional election is over. [1] The appellant did not allege that he intended to run for office in any future election. [2] He did not attempt to maintain a class action on behalf of himself and other putative independent candidates, present or future. [3] He did not sue for himself and others similarly situated as independent *voters,* as he might have under Ohio law . . . [4] He did not seek a declaratory judgment, although that avenue too was open to him. 396 U.S. at 43, 90 S.Ct. at 207 (numbers inserted).

In the instant case, plaintiff Clark does sue for declaratory relief. By its nature, a declaration of the statute's invalidity will work to the benefit of all other candidates. Had Clark been interested in only his own relief, an injunction alone would have sufficed. In the area of election rights, the necessarily expansive nature of a suit for declaratory judgment (the fourth alternative in *Brockington* ) has been held sufficient to give standing even after the particular

found to have sufficient ripe standing to have his case heard.

In addition, however, Clark makes out a convincing argument that as a voter (which he undoubtedly continues to be at this moment) he has a ripe cause, and adequate standing to bring it. While conceding at least this latter point, the concurrence by Judge Leventhal still maintains that there is a "jurisprudential" role to be played in not deciding this case.

*Samuels v. Mackell,* 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), Maj.op., 182 U.S.App.D.C. at ——, 559 F.2d at 650, Conc.op. 182 U.S.App.D.C. at ——, 559 F.2d at 662, does not require a jurisprudential deferring on deciding this case. *Samuels* explicitly dealt with the permissive, discretionary *"may"* grant relief provision of the Declaratory Judgment Act. 401 U.S. at 70, 91 S.Ct. 764. Here, we deal with a statute expressing in the clearest terms of which Congress is capable that challenges to the act *should* be decided by the courts, and as expeditiously as possible. That legislative pronouncement overrides the jurispruden-

tial power. *Samuels'* discussion of equitable notions is inappropriate here.

The concurring opinion by Judge Leventhal suggests that, in enacting the Federal Election Campaign Act, Congress did not remove the discretionary elements from a court's determination of ripeness and standing. He relies on the Act's reference to declaratory judgment relief. Conc.op., 182 U.S.App.D.C. at ——, 559 F.2d at 660. The dissent of Judge Robinson very comprehensively refutes this position as a matter of the intent of Congress, and as construed by the Supreme Court in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). In this connection, it is also useful to note the opinion written by Judge Wright for this circuit in *Gray v. Greyhound Lines,* 178 U.S.App.D.C. 91, 545 F.2d 169 (1976), which found that Congress had removed all but the minimal constitutional requirements for standing in Title VII litigation:

> In addition to its constitutionally based requirement, standing doctrine incorpo-

---

plaintiff's claim was moot. No requirement for a class action was imposed in *Moore v. Ogilvie,* 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969), where the "capable of repetition, yet evading review" doctrine prevented a dismissal for mootness. In *Moore v. Ogilvie,* the petitioners sought to be placed on the Illinois ballot as candidates for presidential electors in the 1968 election. They did not sue as a class. In deciding to review the electoral challenge despite the fact that the election had occurred before the case reached the Supreme Court, the Court did not discuss the likelihood that the twenty-six individual candidates would again run for Presidential or Vice-Presidential elector. Rather, the Court stated:

> But while the 1968 election is over, the burden . . . placed on the nomination of candidates for statewide offices remains and controls future elections, as long as Illinois maintains her present system as she has done since 1935. The problem is therefore "capable of repetition, yet evading review," *Southern Pacific Terminal Co. v. Interstate Commerce Commission,* 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310.

394 U.S. at 816, 89 S.Ct. at 1494.

While *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), was a class action, the Court did not stress that fact in finding standing. The appellant there complained of a residency requirement for voting;

but by the time of the appeal to the Supreme Court, he had fulfilled the necessary conditions. The Court held:

> At the time the opinion below was filed, the next election was to be held in November 1970, at which time Blumstein would have met the three-month part of Tennessee's durational residency requirements. The District Court properly rejected the State's position that the alleged invalidity of the three-month requirement had been rendered moot, and the State does not pursue any mootness argument here. Although appellee now can vote, the problem to voters posed by the Tennessee residence requirements is "capable of repetition, yet evading review." *Moore v. Ogilvie,* [citation omitted], *Southern Pacific Terminal Co. v. ICC* [citation omitted].

405 U.S. at 333, n. 2, 92 S.Ct. at 998, n. 2.

In light of this history regarding election challenges, and the fact that the relief of declaratory judgment unavoidably extends its benefits to those situated similarly to the plaintiff even if not formally in a certified class with him, the applicability of *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) is questionable. It is rather unlikely that the language in *Weinstein v. Bradford* without saying so was intended to overrule the fourth of the standing alternatives offered in *Brockington v. Rhodes.*

rates a prudential limitation on the judicial power . . . . In some statutory schemes, however, Congress has itself determined that standing should be granted to anyone who satisfies the constitutional requirements. Title VII is such a statute. "The use in 42 U.S.C. § 2000e–5 of the language 'a person claiming to be aggrieved' shows a congressional intention to define standing as broadly as is permitted by Article III of the Constitution." *Hackett v. McGuire Brothers, Inc.*, 445 F.2d 442, 446 (3d Cir. 1971). Thus, since plaintiffs have claimed injury in fact as a result of defendants' allegedly illegal practices, they have standing to sue under Title VII. [footnote:] The result is the same under § 1981. *See Johnson v. Railway Express Agency,* 421 U.S. 454, 459, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975).

Judge Wright rested on the language of 42 U.S.C. § 2000e–5(f)(1), which allows that "a civil action may be brought against the respondent named in the charge . . . by the person claiming to be aggrieved." If the language is to be viewed as determinative, there is no effective difference between Title VII's phraseology and that under the Federal Elections Act: "The Commission, the national committee of any political party, or *any individual eligible to vote in any election* for the office of President of the United States *may institute such actions* in the appropriate district court of the United States." 2 U.S.C. § 437h(a) (Supp. V, 1975) (emphasis added).

Most significantly, Title VII includes explicit reference to "any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g) (1970). That language evokes equitable principles far more convincingly than a mere reference to declaratory judgment, without even the words "as *the court deems* appropriate." Hence, Judge Leventhal's insistence on the "juris-

prudential" aspects of standing is directly contradictory to this court's *Gray v. Greyhound* decision.

Even if *Mackell* were proper precedent, and even if, through some construction, the mandatory language of the Federal Election Campaign Act were analogized to the permissive language of the Declaratory Judgments Act, we must ask exactly why is it better to wait?

It is not sufficient to answer, "Let's wait until a one-house veto is actually exercised." The cause of complaint, of which the majority opinion fails to take account, exists even if the veto power were never actually exercised. A great deal of the harm comes from the threat, the potential of a one-house veto. Indeed, if the system works the way plaintiffs allege, all either house of Congress would have to do is to influence the FEC's proposed regulations so that they always came out favorable. Then, piously, each house could refrain from any legislative action incanting, "If that's the way the FEC wants it, so be it." [22] Harm would then come to voters who had been denied the fair and neutral reform regulations promised by the Act, to the President who had been denied the right to exercise his constitutional power, to Congressmen who were denied the voting *power* that the Constitution gives them on regulations constituting rules of law, and to candidates who challenged incumbents, if any were available to bring suit and obtain a judgment before an election "mooted" their claim.

The majority suggests that more briefing might be appropriate on the constitutional challenge. (Maj.op., 182 U.S.App.D.C. at ——, n.8, 559 F.2d at 649 n.8). Why, then, does this court not order more briefing? It is not the circumstances of the case, which are entirely adequate to resolve the constitutional question at issue, but the de-

---

**22.** The majority would like an instance where an FEC regulation was "clearly trimmed" out of deference to some of the leaders of a single house of Congress. (Maj.op., 182 U.S.App. D.C. at —— n.10, 559 F.2d at 650 n.10). Yet if the influence is as alleged, evidence that the Commission "clearly trimmed" a particular

rule will never arise, or be as difficult to prove as a criminal charge of influence-selling. The logic of *Moore v. Ogilvie,* 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969), is compelling here, that the harm complained of complicates review because of its transitory nature.

fendants' voluntarily chosen tactics that account for the poor defense made for the one-house veto on the present record. As the previous section indicates, whether the one-house veto is upheld or struck down, the elements of the constitutional issue (separation of powers, presidential prerogative, congressional prerogative) are now capable of discussion and resolution.

The nature of the challenges here do not require a setting grounded in actual regulations which have become law or have been vetoed. Neither plaintiff nor intervenor is challenging a particular regulation. Neither alleges that any one regulation would be more favorable or unfavorable than another to any party. Rather, both complain of an *unconstitutional scheme,* whose development is already quite clear. Most importantly, the harm complained of here might very well never be more clearly expressed. The majority opinion simply sweeps away an entire area of harm with its statement, "Until Congress exercises the one-house veto, it may be difficult to present a case with sufficient concreteness as to standing and ripeness to justify judicial resolution of the pervasive constitutional issue which the one-house veto provision involves." (Maj. op., 182 U.S.App.D.C. at ——, 559 F.2d at 649). I dissent from the refusal to act on this premise. It is the unconstitutional hurdle to effective regulations and not any particular regulation that presents the specific vice.

A final fear of the majority opinion is that a holding of unconstitutionality here might involve over 200 other statutes that contain some form or another of one-house vetoes. In view of the weak defense presented for the one-house veto here that might well be the case. If that would result, so be it. That, instead of being a reason for not considering the issue, is a strong reason why the case *should* be heard. If the improper practice is that far-reaching courts should take quick steps to eradicate its evils.

At the Congressional Research Service document cited (Maj.op., 182 U.S.App.D.C.

at —— n.10, 559 F.2d at 650 n.10) indicates, however, a great many of these provisions are functionally inoperative. Also, the impact of such a holding will depend upon the precise nature of each congressional act, particularly as to whether the one-house veto provision is severable or not. Each of these statutes can be evaluated by these standards when and if it is challenged.

The standing requirement is imposed to guarantee "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of different constitutional questions." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The positions in this case could not be more adverse. Congress, with its incumbents in office, and the FEC, are opposed by a voter; and his attack is supported in large part by the Department of Justice that has a very definite separate interest, *i. e.,* to assure that federal elections are conducted under *rules of law* constitutionally enacted.

The fact that adjudication of a scheme for promulgating legislation will take place before the implementation of a regulation is no bar to Article III jurisdiction. *The Voting Rights Act is a perfect example.* In those cases the state-proposed voting qualifications are adjudged constitutional or not in the U.S. District Court for the District of Columbia, *before* there is *any* possibility of obtaining evidence of how those regulations would function in actual practice.[23] Indeed, that law suspended the state laws until theoretical determination could be made, and similarly prevented the implementation of new voting regulations. The law was upheld in *South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). And we are presented in this case with harm of the most serious proportions that might never present itself in more ripe context.

**23.** 42 U.S.C. § 1973c (1970), *as amended,* (Supp. V, 1975).

## V. ADEQUACY OF THE RECORD

The two opinions that control the disposition of this case, and find that the court did not have jurisdiction, rely heavily upon what they term the lack of a "full-bodied record" with ripe concrete issues. Complaint is also made that the issues are novel and that reflection and development are necessary before a rush to judgment.[24] When the underlying reasons for these asserted conclusions are examined they add up principally to the fact that Congress has not vetoed any proposed regulation of *this* Commission and that we need to know more about the operation of the veto mechanism. It is also suggested that if a regulation had been vetoed the court might examine the *reasons* Congress gives for its action. But such examination could not result in altering the congressional action whether the court approved or disapproved of the reasons it concluded motivated the result. It is extremely difficult to determine the true motivation for the actions of any legislative body. Motivations are as diverse as the membership and, whatever reasons may be stated, subjecting legislative reasons to inquiry, except in rare circumstances, is beyond the proper scope of judicial review.[25] Inquiry into reasons is thus an extreme suggestion and the argument that the lack of a veto of a specific regulation should operate to foreclose this court from deciding *the facial* validity of the Act overlooks the nature of appellant's objection.

Appellant's principal complaint is not that a particular regulation was, or was not vetoed,[26] but that as a voter he has been harmed by the scheme of the statute which subjects *all regulations* of the Commission to an unconstitutional procedure with inherent damage that has improperly influenced, delayed and admittedly tainted the pending regulations, impermissibly taints the promulgation of all regulations under this statute, and has resulted in one house of Congress, in two instances, vetoing regulations proposed by the first Commission. When *one house* vetoes a proposed Commission regulation, it acts as an integral part of the independent executive agency and thus plainly trespasses beyond its constitutional *legislative* orbit prescribed by art. I, section 1 of the Constitution.

When the *votes* of *two houses* approve a proposed Commission regulation, by voting not to veto it, and such action results in the establishment of a "rule of law," the two houses act legislatively and clearly violate art. I, section 7, clause 3, which requires the President's approval to each such "vote."

The principal underlying cause of the absence of the "full-bodied record" my colleagues seek here is the refusal of Valeo to brief the major issue in the case, *i. e.,* the validity of the one-house veto. By this maneuver Valeo now, because of the concurrence of my colleagues, denies *jurisdiction* to this court to consider and decide that issue. This is the first instance to my knowledge where a court has elevated such conduct on the part of a defendant into a *jurisdictional* defect. It is submitted that this stratagem on the part of the defendant should not succeed and, since that alleged defect is easily capable of rectification by this court, that the court should order full briefing, if it considers same would be necessary and helpful before deciding the issue. No hurry exists about the case, though it does have a statutory priority, and the

---

**24.** Novel issues are not a novelty with this court and the time encompassed in disposing of this case in this court has allowed more than sufficient opportunity for reflection and development.

**25.** *Fletcher v. Peck,* 10 U.S. (6 Cranch.) 87, 129–131, 3 L.Ed. 162 (1810); *D.C. Federation of Civic Associations v. Volpe,* 148 U.S.App.D.C. 207, 223, 459 F.2d 1231, 1247 (1971), *cert. denied,* 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972); *cf. Griffin v. County School Bd. of Prince Edward County,* 377 U.S. 218, 231, 84

S.Ct. 1226, 12 L.Ed.2d 256 (1964); *Gomillion v. Lightfoot,* 364 U.S. 339, 347, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). *But see Palmer v. Thompson,* 403 U.S. 217, 224–225, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971). The present situation is a case in point. Why did one house of Congress not meet on the extra day or two necessary to permit the presently proposed regulations to become effective for the past national election?

**26.** When objections to specific regulations arise they can be decided separately.

court is not prevented from taking all the time necessary to have the case fully presented, briefed and argued. There is no justifiable judicial reason for having our jurisdiction thwarted by the acts of the defendant when the means of correction are easily within our grasp. To assert that future actions which are promptly begun and vigorously prosecuted can provide a timely decision is belied by the results in this case. The normal period in most states between the close of primary filings for candidates and the date of the primary election is insufficient time within which to commence a suit and obtain a decision under normal trial and appellate procedures. If a "full-bodied record" is desired, and something more than is here present is considered necessary before deciding the issue, *this is the case in which to get it.*

I respectfully dissent.